TIMOTHY J. MCINERNEY *vs*. MASSASOIT GREYHOUND ASSOCIATION, INC. & another.

Suffolk. December 11, 1970. — April 20, 1971.

Present: SPALDING, CUTTER, SPIEGEL, REARDON, & QUIRICO, JJ.

*Attorney at Law. Contract,* Validity, For compensation of attorney. *Champerty.*

At the trial of a suit in equity by an attorney against his client, evidence that under fee agreements prepared by the plaintiff and signed by the defendant the plaintiff would receive a fee "on the domestic relations matter [of the defendant] either on a divorce libel or a separate support petition" in any event, and testimony of the defendant that she would "naturally" have paid him for his services, required a conclusion as a matter of law that the fee agreements were not champertous, although the agreements included an undertaking by the defendant to assign to the plaintiff one-third of any stock of a corporation which she would receive in the property settlement with her husband, negotiated by the plaintiff, and although he paid the court costs himself, for which he expected to be, and in fact was, reimbursed. [348–349]

A certain fee agreement prepared by an attorney and signed by his client, and antedating the comprehensive coverage of contingent fees by Rule 14 of the General Rules, 348 Mass. 806, examined in the light of that rule. [349–351]

In a suit in equity by an attorney against his client, a conclusion that a fee agreement entered into by the parties when the plaintiff was first consulted by the defendant with respect to her marital problems, as

---

revised more than four years later after recent activity culminating in a separate support proceeding and in a property settlement between the defendant and her husband, was "excessive and unreasonable as a matter of law," was required by evidence at the trial that the plaintiff received a $1,000 retainer from the defendant and a separate fee of $25,000 from her husband in connection with the separate support proceeding, that the value of the plaintiff's services was about $20,000, that the total fee which the plaintiff would receive would be about $131,800 by reason of an assignment by the defendant to the plaintiff of stock in a corporation which the defendant received in the property settlement and by reason of monthly instalments payable by the defendant to the plaintiff for the rest of the defendant's life as compensation for securing her a life employment contract from the corporation, and that "much of the alleged time and effort spent . . . [by the plaintiff] was in fact due to . . . [his] intense desire to obtain the . . . stock" of the corporation; and it was held that the purported assignment of stock was null and void and that the plaintiff must return to the defendant such monthly instalments received from her. [351–355]

BILL IN EQUITY filed in the Superior Court on June 14, 1968.

The suit was heard by *Smith*, J.

*Richard Wait* (*Timothy J. McInerney* with him) for the plaintiff.

*Frank L. Kozol* (*Harvey E. Pies* with him) for Massasoit Greyhound Association, Inc.; *Robert G. Clark, Jr.*, for Elinor E. Farrell, also with him.

REARDON, J. The case is before us on appeal by the plaintiff from a final decree dismissing his bill for declaratory relief. The judge made findings of facts, and we have, in addition, a report of the evidence and numerous exhibits.

The bill seeks determination of the rights of the plaintiff in 167 shares of the common stock of Massasoit Greyhound Association, Inc. (Massasoit), alleging the assignment of that stock to him by the defendant Elinor E. Farrell (Elinor). The defendants filed answers and counterclaims, in general denying the validity of the assignment of the shares by Elinor to the plaintiff for reasons which will be discussed, and stating further that the actions of the plaintiff in his capacity as a lawyer were such as to preclude giving him the relief he seeks. The defendant Elinor in her counterclaim specifically characterized the

assignment and an agreement as "champertous, unconscionable and inequitable."

The plaintiff bases his claim on an arrangement for fees which provided that he would retain one-third from any settlement he obtained for Elinor over and above alimony and support payments. He asks us to enforce that agreement and, in particular, to state his right to 167 shares in Massasoit, one-third of the 500 shares which became the property of Elinor on the death of her husband, pursuant to a property settlement negotiated by the plaintiff. Elinor, who repudiates the agreement, has entered an agreement to sell the entire block of 500 shares to Massasoit. Massasoit's counterclaim alleges that the purported assignment to the plaintiff of the 167 shares was of no force and effect, not only because of the invalidity of the fee agreement, but also because the restrictions on the transfer of its stock provided for in the amended articles of organization of the corporation were not complied with by either party to that assignment. The trial judge concluded that the "so-called contract was champertous, unreasonable and unenforceable," and that "Massasoit acted within its rights in refusing to accept McInerney as a valid stockholder." He further found that since the stock transfer restrictions were not complied with by Elinor or the plaintiff there was no valid transfer to the plaintiff of the Massasoit stock by Elinor.

1. A proper disposition of this case necessitates a fairly full account of the facts. Following a telephone call from Elinor to the plaintiff seeking a discussion with him concerning her marital difficulties with her husband, the late Stanley Russell Murray, who had left her in July, 1961, she met with the plaintiff on August 17 of that year at his office in Boston. She brought with her various documents relative to her problems. After a ten or fifteen minute discussion the plaintiff told her, "We'll have to make an agreement at the threshold of my professional relationship with you." He thereupon dictated the first version of the fee agreement which underlies this suit. The

agreement, signed by Elinor and the plaintiff, provided that he was to obtain a separate support or divorce decree for her in addition to a property settlement, and secure for her "everything which . . . [she was] entitled to receive from . . . [her] husband." In return for the plaintiff's services she undertook to pay him a reasonable fee, with the understanding explicitly stated in the agreement that the fee might be paid by her husband pursuant to an order of the probate judge. In addition, she agreed to pay the plaintiff "a fee of a sum equal to one-third (1/3) of everything obtained for me over and above payments by way of support or alimony including a fee of a sum equal to one-third (1/3) of anything recovered, if it becomes necessary to litigate the question of title to stock I now hold in my possession . . . in [Massasoit]." At this time she was in possession of 1,500 shares which she claimed as a gift from her husband. On this first visit to the plaintiff's office she remained for several hours.

Thereafter it would appear that there was comparatively little activity on the plaintiff's part until the spring of 1964 when, on June 18, a petition for separate support and a petition in equity to determine title to 1,500 shares in Massasoit were filed by the plaintiff in the Probate Court for Suffolk County. Meanwhile, through some arrangement not clear to us on the record, Elinor relinquished possession of the 1,500 shares to her husband, who subsequently transferred 975 of them by assignment to others named as defendants in the bill in equity. The equity proceeding came on for trial in November, 1965, on parts of nine days. Trial was terminated by negotiations entered into by the plaintiff, chiefly with Mr. Edmund Burke representing Murray. These negotiations culminated in a separate support agreement, an employment agreement, and a voting trust, all drafted in Mr. Burke's office. The separate support agreement provided that Murray was to pay Elinor $20,000 a year free of taxes by way of support, and that Massasoit was to buy from her the house in which she lived for $25,000 free of taxes, and

sell to her its furnishings for $2,500. It provided also for the immediate payment by Murray of $25,000, which it was understood by the parties would be paid over to the plaintiff as a fee for services to Elinor. The employment agreement provided that Massasoit was to employ Elinor at $7,500 a year for life, requiring of her unspecified duties which it was understood would be sufficient to satisfy the Internal Revenue Service but which would have due regard for her other obligations, including obligations to her family. The voting trust agreement set up a trust of 500 shares of Massasoit common stock for the benefit of Elinor, with voting rights and rights to dividends in Murray until his death, at which time she was to receive the shares outright. This settlement was agreeable to Elinor, who nonetheless was left with the feeling that she was being overcharged by the plaintiff. Accompanied by her brother-in-law, she went to the plaintiff's office late in December, 1965, to discuss the matter of fees, a visit which the plaintiff resented. At no time did she or did the plaintiff suggest that she seek independent legal advice.[1]

The plaintiff testified in the instant suit that at length, on December 28, 1965, after having accused Elinor of trying to "chisel" him when he had done a good job for her, he agreed "to shave" his fee. Elinor testified that the plaintiff rejected her suggestion that they submit his proposed fee to the probate judge for approval, claiming it would jeopardize her settlement. The plaintiff testified in his turn that he felt "it was not necessary" to submit his fees to the probate judge, although he conceded that was "generally" the practice.

On December 28, 1965, Elinor signed a revised, second version of the fee agreement written out in longhand by the plaintiff, who signed it as a witness. Under the terms of this agreement Elinor "hereby, freely & voluntarily . . . [agreed] to pay to Mr. McInerney after reflection, & after consulting others [not disclosed], the following: — a) 1/3

---

[1] In fact, at the trial the plaintiff referred to her as "a pretty knowledgeable woman. . . . She knew her way around. She was no babe in the woods."

of the shares I receive under the settlement from Murray
& I will give him an assignment of said shares forthwith.
b) the sum of $40,000. as a fee for the $7,500 per annum
employment contract for the rest of my life (33 yrs. by life
expectancy tables) & I shall pay this sum at the rate of
$2,000 per annum, at monthly intervals out of the employ-
ment contract receipts. Mr. McInerney is to receive my
monthly checks from M.G.A. Inc. & Murray so as to in-
sure prompt payments by them & he in turn will forward
the appropriate amounts to me." The property settle-
ment, on the terms of which there had been previous agree-
ment, was executed on January 26 and 27, 1966. As part
of the settlement, voting trust certificate No. 110 for 500
shares was issued to Elinor. At the same time the plain-
tiff had Elinor sign a stock assignment separate from the
certificate assigning to him 167 shares from the trust. He
took this action despite his and Elinor's noncompliance
with restrictions on the transfer of stock contained in
Massasoit's amended articles of organization and sum-
marized on the face of the voting trust certificate in the
following terms: "Any holder of a Voting Trust Certificate
who wishes to sell or transfer the same to any person not
a holder of the stock of said Massasoit Greyhound Associa-
tion, Inc. or of a Voting Trust Certificate for the same,
and any person who acquires a Voting Trust Certificate
otherwise than by transfer to a holder of the stock of said
corporation or of a Voting Trust Certificate for the same,
is required to offer the Voting Trust Certificate to the
corporation for purchase." Reference to these restrictions
was also contained in the voting trust agreement. The
plaintiff, having gone over and approved the language of
both, and having read the amended articles of organization
in the Secretary of State's office, was thoroughly familiar
with them. The restrictions had been waived by action of
the board of directors to allow the transfer provided in the
voting trust.

As had been understood by the parties, the plaintiff re-
ceived from Murray a fee consisting of the $25,000 speci-

fied in the separate support agreement directly upon its execution. On February 10, 1966, both the proceeding in equity and the separate support proceeding were terminated by agreement, the former with prejudice and without costs. It is to be noted that the plaintiff had not succeeded in winning back for Elinor any of the shares which Murray had transferred to others after Elinor released possession of them to him pursuant to the plaintiff's instruction. On March 15, 1966, the plaintiff sent to Elinor for the first time a copy of the fee agreement he had had her sign in December, along with certain other documents dealing with the litigation.

The voting trust was terminated by Murray's death in early August, 1966. Shortly thereafter, on August 17, 1966, stock certificate No. 110 for 500 shares was issued to Elinor. On the same day the plaintiff had Elinor sign in his office a "Stock Assignment Separate From Certificate," purporting to "sell, assign and transfer unto Timothy J. McInerney" 167 shares of Massasoit common stock "standing in my name on the books of the . . . corporation and represented by Certificate #110, attached herewith." When she personally received that certificate on September 1, 1966,[2] Elinor relinquished possession of it to the plaintiff who kept it until the trial of this case. The plaintiff testified somewhat improbably at the trial that at this time he was "of the impression" that the stock restrictions had been waived. In fact, according to the testimony of Mr. J. Barry Morrissey, clerk of Massasoit, there was no waiver by the directors of the restrictions on transfer of the 167 shares claimed by the plaintiff nor any request for one. Prior to September 1, 1966, Mr. Morrissey, who was active in the negotiations among the various parties from November, 1965, was unaware that the plaintiff claimed any of the shares. The plaintiff testified that on

---

[2] The transaction was also evidenced by a general release and acknowledgment and an assignment of the voting trust certificate to Mr. Burke by Elinor, both dated August 17, 1966, and a release of the trustee and receipt of certificate No. 110 by Elinor, both dated September 1, 1966.

numerous occasions he made Mr. Burke, since deceased, aware of his claim and that Mr. Burke acknowledged it. However, it is at least unusual that the plaintiff, as a primary participant in the drafting and execution of the settlement papers, at no time saw fit to make reference to his claim in a document to which either Massasoit or Murray was signatory.

The seeds of discontent having been sown, there was a temporary détente among the various parties until May, 1967. At that time the monthly checks from Massasoit to Elinor, which had been coming directly to the plaintiff and from which he had been deducting the sum of $166.67, ceased coming to him. In the following month he received a letter from Mr. Robert G. Clark, Jr., a lawyer whom Elinor had retained to straighten out her difficulty with the plaintiff, advising him that Elinor thought the fee agreement was "exorbitant and unconscionable" and suggesting that they discuss the matter. Further action by the plaintiff came only when he received information during a telephone conversation with Mr. Clark on December 19, 1967, that Elinor had "transferred all of her right, title and interest in stock to Raynham [Massasoit] as of a week or a week and a half ago." In truth, she had offered to sell the shares to the corporation on December 8, 1967, and the offer had been accepted.[3]

Formal controversy was initiated thereafter by a letter dated January 17, 1968, from the plaintiff to Massasoit requesting the issue to him of "a new certificate for One Hundred Sixty-seven (167) shares of the Capital Stock of . . . [Massasoit] in my name . . . ." Mr. Morrissey replied for Massasoit by letter dated January 24, 1968, advising the plaintiff that the purported assignment to him "is not recognized by the Corporation" because it is "invalid, null and void under the terms of the Articles of Organization of the Corporation"; that he was not recognized as "either a record or beneficial holder" of any

---

[3] The offer makes reference to the plaintiff's adverse claim but alleges that it is pursuant to an assignment which is "illegal and unenforceable."

shares; and demanded that he return to the corporation stock certificate No. 110 then in his possession.

On June 14, 1968, the plaintiff filed this suit, along with two actions at law in the Suffolk Superior Court, one in contract and one in tort and both stemming from the same set of facts.

At the trial the plaintiff presented a compilation of all the hours devoted to Elinor's problems recorded in his diary (including some four hours during which he attended the wake and funeral Mass of the decedent Murray). Together with telephone calls made and received the hours totaled over 400.[4] Accepting the plaintiff's statement that he was then charging $50 an hour, the trial judge found that the value of his services was about $20,000. By contrast, taking the present value of the Massasoit stock as $400 to $550 a share, a figure well supported on the record,[5] the trial judge found that under the 1965 agreement the plaintiff would receive a fee totaling about $131,800, depending on the length of Elinor's life.[6] In addition to the $25,000 received from Murray, the plaintiff has received already about $2,666.56 from Elinor in monthly payments through May, 1967, in addition to a $1,000 retainer which she testified she paid to him at the outset.

The issues in this case are two: first, whether the fee arrangement dictated by the plaintiff is unenforceable, and, second, if not, whether the assignment of shares pursuant to that arrangement was void by reason of noncompliance with the corporate restrictions on transfer of stock. In view of our resolution of the first question there

---

[4] The trial judge disregarded, and we think rightfully so, the plaintiff's contention at the trial that this compilation left out some 600 hours spent in research of the law and discussing the case with associates. Apart from the inherent lack of credibility of such a statement, the compilation includes many entries which would seem to fit this category.

[5] There was evidence that the stock had previously been worth more. The plaintiff testified at a pre-trial deposition that at the time of the 1965 agreement he felt that the value of the stock was $555 to $1,000 a share.

[6] The plaintiff estimated the fee due him under the second fee agreement as $106,800, down $63,200 from the figure he was to receive under the 1961 agreement.

is no need for us to consider the second. Relative to the second question, we note only that the plaintiff's evident wilful noncompliance with clear restrictions well known to him, and his arrangement of a transaction with his client whereby she was also not to comply with them, are actions not becoming a lawyer.

2. The defendants urge upon us, and the trial judge found, that the fee agreement was champertous. However, we are compelled to conclude that this finding was wrong as a matter of law. Champerty is a narrow and somewhat technical concept which we have defined as " 'the unlawful maintenance of a suit in consideration of some bargain to have part of the thing in dispute or some profit out of it,' 'whereupon the champertor is to carry on the party's suit at his own expense.' " *Sherwin-Williams Co.* v. *J. Mannos & Sons, Inc.* 287 Mass. 304, 312. *Scott* v. *Harmon,* 109 Mass. 237, 238. *Holdsworth* v. *Healey,* 249 Mass. 436, 439. A distinction is drawn where there is to be a debt running from the client to the attorney in any event, even though the amount may depend on the success of the suit and the fruits of the litigation are contemplated to be the means by which the fee will be paid. *Blaisdell* v. *Ahern,* 144 Mass. 393, 395. *Taylor* v. *Rosenberg,* 219 Mass. 113. *Bennett* v. *Tighe,* 224 Mass. 159.

Upon examination of the trial transcript, it seems clear that this contract, either in its first or final forms, was of the latter category. The plaintiff was to receive a fee "on the domestic relations matter, either on a divorce libel or a separate support petition" in any event. In addition, Elinor testified that even if the plaintiff had been unable to get anything for her beyond alimony payments she would "naturally" have paid him for his services. Whether or not Elinor's statement that she gave the plaintiff a $1,000 retainer fee is believed,[7] the above facts preclude the

---

[7] Since he found that there was no retainer, the trial judge evidently did not believe it, although the information was not contradicted and freely volunteered twice by Elinor.

characterization of this arrangement as champertous. We do not regard as significant the fact that the plaintiff paid some $1,000 in court costs himself, since advance of court costs by the lawyer during the course of litigation is not an uncommon practice today. McKinnon, Contingent Fees for Legal Services, Report of the American Bar Foundation, 69. Clearly the plaintiff expected to be, and was in fact, more than adequately reimbursed for these costs, even if there was no specific provision relating to them in the contract.

3. Although we feel that under our case law on champerty this contract is not champertous, we prefer not to have to rely on this theory in any event. There is an increasingly prevalent practice of charging contingent fees. Although contingent fees are susceptible to great abuse, they provide also a method for the litigation of meritorious cases by litigants of little or no means. Their increasing acceptance in principle and the decline of champerty, maintenance, and barratry as offences is symptomatic of a fundamental change in society's view of litigation — from "a social ill, which, like other disputes and quarrels, should be minimized" to "a socially useful way to resolve disputes." McKinnon, *supra,* at 210.

The doctrine of champerty is thus a tool ill fitted to curb the evils attendant upon contingent fees. We noted this fact nearly nine years ago in *Sullivan* v. *Goulette,* 344 Mass. 307, 312, in which we suggested that the subject might be dealt with by court rules. After that time Rule 14 of the General Rules was adopted on November 2, 1964, effective January 1, 1965, 348 Mass. 806, dealing comprehensively with contingent fees.[8] In providing that "[u]nless expressly prohibited by this rule, no written contingent fee agreement shall be regarded as champertous if made in an effort in good faith reasonably to comply with this rule," the rule indicates that the standards it sets forth are meant to

---

[8] The rule is now S. J. C. Rule 3:14, 351 Mass. 795.

replace the old law of champerty. In this case, however, where the initial agreement was drawn up three years before the rule was adopted, we do not judge the agreement strictly according to the terms of the rule. Nonetheless, the requirements of the rule are reasonable and its prohibitions are echoed in the law of many States which have antedated Massachusetts in their acceptance of contingent fees. McKinnon, *supra*, at 39. Further, the rule can be said simply to repeat concepts which have been implicitly recognized in our law for many years. Thus it is instructive in a general evaluation of the reasonableness of the fee arrangement in this case to examine it in the light of the rule.

First, it is clear that the agreement[9] comes within the definition of "contingent fee agreement" contained in paragraph (1) of the rule as "an agreement . . . under which compensation, contingent . . . in part upon the successful accomplishment or disposition of the subject matter of the agreement, is to be in an amount which . . . is to be determined under a formula." Passing to paragraph (3) of the rule, which contains various prohibitions, we note the prohibition against contingent fee agreements made "in respect of the procuring of a divorce, annulment of marriage or legal separation." Such a prohibition is "a nearly uniform rule" in States which accept contingent fees in principle. McKinnon, *supra*, at 45. 15 Ala. L. Rev. 208–213 (Fall, 1962). Corbin, Contracts, § 1424. Restatement: Contracts, § 542 (2). Annotation, 30 A. L. R. 188. It is based on fear that such arrangements act as an inducement to divorce and as an obstacle to the court's duty to set up an equitable property settlement as among the parties to the marriage and any children. *Jordan* v. *Westerman*, 62 Mich. 170, 180. *Lynde* v. *Lynde*, 19 Dick. 736, 757–758 (N. J.). *In re Smith*, 42 Wash. 2d 188, 196.

The agreement which we have under consideration illus-

---

[9] "Agreement" where used herein without modification refers equally to the 1961 and 1965 arrangements. Where reference is meant to only one, it is so specified.

trates both policy reasons which justify paragraph (3) of the rule.[10]

The first reason for the dim view generally taken of contracts such as this is apparent in the manner in which this one originated. It was drawn up after only ten or fifteen minutes conversation, the plaintiff apparently disregarding the fact that Elinor and the decedent Murray had been married for ten years at that time and had separated only the month before. The implicit conclusion on the part of the plaintiff that the break in their relations was permanent was at best hasty, colored, one suspects, by the plaintiff's immediately manifested desire to procure a portion of Elinor's stock for himself. With respect to the second policy reason stated above, it is relevant that the various documents defining the property settlement between Murray and Elinor nowhere reveal any interest of the plaintiff in the stock contained in the voting trust for Elinor. The probate judge necessarily, therefore, approved the overall settlement on an incomplete factual basis. The settlement was in fact not that which the papers disclosed. Such conduct on the part of the plaintiff does not commend itself to us.

4. Although we do not feel we can invalidate this agreement under the rule because in its original form it antedated the rule, it has traditionally been within the power of this court to refuse to enforce a fee contract which we found was "excessive and unreasonable as matter of law." *Abrams* v. *Loew*, 335 Mass. 96, 100. We agree with the trial judge that this contract falls in that category and that the purported assignment was therefore null and void. We find this conclusion supported both by the case law in this and other

_____

[10] The prohibitions therein contained would extend to this agreement although it provides for a fee. As was stated in *Singleton* v. *Foreman*, 435 F. 2d 962, 969–970 (5th Cir.) where the contract in question provided for a retainer of $25,000, plus one-third the value of any settlement obtained for the client, "the contract . . . was clearly non-divisible. The retainer and contingent fee were related to the sole object of employment, the divorce. The parties did not contemplate a piece work relationship. . . . With the illegal portion of the contract excised, the greater portion of the consideration was eliminated. It is impossible to think that a portion of the contract with this much significance could be entirely 'eliminated from the contract and still leave a valid working arrangement fairly reflecting the original mutual understanding between the parties.'"

jurisdictions and by the canons and other guidelines of the American Bar Association, which we have previously held are to be considered in judging the conduct of attorneys in this State. *In Matter of Cohen,* 261 Mass. 484, 487. See *Burt* v. *Gahan,* 351 Mass. 340, 342.

As a contract entered into before the attorney-client relationship was established (*Setzer* v. *Robinson,* 57 Cal. 2d 213), the contract is prima facie valid and binding. *Boston Bar Assn.* v. *Hale,* 197 Mass. 423, 437. In addition, in setting a fee there are many relevant considerations beside the amount of time anticipated as necessary to resolve the case. These include "the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, . . . the prices usually charged for similar services by other attorneys in the same neighborhood, . . . the value of the property affected by the controversy, and the results secured." *Cummings* v. *National Shawmut Bank,* 284 Mass. 563, 569. The *Cummings* case provides a great deal of well advised flexibility to attorneys in setting fees, but it does not give a total carte blanche. The second contract by which Elinor bound herself compelled her to pay a monthly stipend for the rest of her life, as well as to hand over to the plaintiff one-third of the stock received from her husband. The plaintiff's services to her had been to represent her in a separate support proceeding and to negotiate a property settlement with her husband. A separate support proceeding, while it may have its moments of drama, is not generally a proceeding providing the most challenging of tasks for a lawyer. In addition, the plaintiff received a separate fee of $25,000 from Murray for this service. With respect to the property settlement, since Murray was comfortably well off it is not surprising nor any particular tribute to the plaintiff that the settlement amounted to enough to leave Elinor in comfortable circumstances. We are therefore not inclined to place our imprimatur on an agreement dictated by a member of the bar which provided for so much to him in return for so little.

We have found no comparable case in Massachusetts. However, in a similar New York case, *In Matter of Cohen,* 169 App. Div. (N. Y.) 544, 546–547, an attorney was required to return part of a fee he had charged. There, as here, the amount of property involved was great and the client had initially consented to a larger fee. The court which decided the *Cohen* case was not impressed by either fact, however. It noted rather that "[t]he proceeding was neither intricate nor unusually difficult," and stated, "It is no less improper for an attorney to take advantage of his client's necessities and inexperience to induce him to make a contract in advance to pay an exorbitant fee for services, than it is to take advantage of those necessities and that inexperience to exact an unreasonable fee after the services have been rendered."

In another New York case the court, relying on the *Cohen* case, condemned the attitude of a lawyer called as a witness at the trial to the effect that "if I'm going to work for a man and he agrees on how much to pay me, that ends the matter." *In Matter of Potenza,* 29 App. Div. 2d (N. Y.) 213, 215. We find more than an incidental similarity between this attitude and the plaintiff's insistence, when the judge assessed the fair value of his services using the plaintiff's own figures for time spent and rates charged hourly, that "[he was] seeking to enforce a contract" as opposed to "[establishing] compensation for services to a client." Later in the proceedings his rejoinder to the trial judge's remark that he (the judge) was interested in "the fair and reasonable charge" was that the plaintiff's charge "was made on a firm contract which we had at the outset and having in mind the rule of *Cummings* v. *Shawmut Bank.*" This notion that the *Cummings* case permits a complete dichotomy between a fee which is reasonable in the light of hindsight and one which is permissible at the outset amounts to much the same sentiment as that condemned in the *Potenza* case, although not expressed so bluntly. The law in this Commonwealth is not now and never has been to this effect.

5. Support for our position is to be found in the various

relevant pronouncements of the American Bar Association. We refer particularly to Canon 12 of the now supplanted Canons of Professional Ethics dealing in general with the subject of fees, and Disciplinary Rule (DR) 2–106 of Canon 2 of the recently adopted Code of Professional Responsibility and Canons of Judicial Ethics,[11] expanding and refining Canon 12. Both contain a list of relevant factors to be considered when setting a fee which is substantially identical to that contained in *Cummings* v. *National Shawmut Bank*, 284 Mass. 563. DR 2–106 contains in addition to this list an overall standard for judging the propriety of a fee which is strikingly similar to that applied by the trial judge. We approve both his standard and his conclusion that "no competent attorney, if present at the time of the execution of these so-called contracts, would advise or permit Elinor to agree to such terms . . . ."

An overreaching by the plaintiff in violation of the prior Canon 12 and DR 2–106 is indicated in addition by the trial judge's stated belief, which is amply supported in the transcript, "that much of the alleged time and effort spent following the termination of the probate cases was in fact due to McInerney's intense desire to obtain the shares of Massasoit stock." We find considerable similarity between this finding and that of the Supreme Court of Nebraska in a case involving a violation of Canon 12: "We think what . . . [the attorney] did . . . indicates a greater interest in his personal financial welfare than in his professional conduct in relationship to both his clients and the court." *State ex rel. Nebraska State Bar Assn.* v. *Richards*, 165 Neb. 80, 89.

6. Finally, we feel it advisable to point out to the plaintiff the view unanimously held among lawyers with respect to suits against a client for a fee. This view was embodied in Canon 14 of the now supplanted Canons of Professional Ethics: "Controversies with clients concerning compensa-

---

[11] The Code has been adopted in some thirty States but not as yet in this Commonwealth.

tion are to be avoided by the lawyer so far as shall be compatible with his self-respect and with his right to receive reasonable recompense for his services; and *lawsuits with clients should be resorted to only to prevent injustice, imposition or fraud*" (emphasis supplied). See Ethical Consideration (EC) 2–23, Canon 2, Code of Professional Responsibility and Canons of Judicial Ethics; American Bar Association Opinion 250.

7. The bill should not have been dismissed. *Travers* v. *Grossman*, 352 Mass. 182, 185, and cases cited.

8. The final decree is reversed. A new final decree is to be entered as follows: It shall declare that the agreement between the plaintiff and Elinor of August 17, 1961, as revised on December 28, 1965, is null and void. It shall order the plaintiff to return to Elinor the $2,666.56 received by him in monthly payments through May, 1967, pursuant to the terms of the agreement. It shall declare that the purported assignment of 167 shares of Massasoit common stock from Elinor to the plaintiff is null and void and that Massasoit's purchase of Elinor's 500 shares is final and legally binding as between the parties thereto. It shall order that certificate No. 110 for 500 shares and the assignment of 167 shares to the plaintiff be delivered to Elinor, the former to be transferred by her in accordance with the terms of the arrangement entered into with Massasoit in December, 1967. In all other respects it shall deny the relief sought in the counterclaims of the defendants. The defendants shall have costs of appeal.

*So ordered.*