LISA SALADINI *vs.* GEORGE P. RIGHELLIS; ALVIN GOLDSTEIN,
third-party defendant.

Middlesex. October 6, 1997. - December 8, 1997.

Present (Sitting at Lowell): WILKINS, C.J., ABRAMS, LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Champerty.*

Discussion of the comparative history of the doctrine of champerty and its development in the Commonwealth. [233-234]

This court ruled that the common law doctrines of champerty, maintenance and barratry shall no longer be recognized in the Commonwealth. [234-237]

A contract action, which a Superior Court judge had, on his own motion, dismissed on the ground that the agreement was champertous, was remanded for further proceedings. [237]

CIVIL ACTION commenced in the Superior Court Department on December 2, 1994.

Entry of a judgment of dismissal was ordered by *Elizabeth B. Donovan*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*David J. Fine* for the plaintiff.

*Joel Rosen* for George P. Righellis.

MARSHALL, J. The plaintiff, Lisa Saladini, appeals from the decision of a judge in the Superior Court dismissing her complaint, sua sponte, on the ground that a written agreement she had with the defendant, George P. Righellis, was champertous and unenforceable. Saladini had sought a declaratory judgment establishing her rights under the agreement. We granted Saladini's application for direct appellate review to consider whether we should continue to enforce the doctrine. We rule that the common law doctrines of champerty, barratry, and maintenance no longer shall be recognized in Massachusetts.

We reverse the judgment entered in the Superior Court and remand this case for further proceedings.[1]

I

On September 23, 1992, Saladini and Righellis entered into a written agreement (agreement) pursuant to which Saladini agreed to advance funds to Righellis to allow him to pursue potential legal claims he had arising out of his interest in real estate in Cambridge, known as Putnam Manor. In return, Righellis agreed that, if pursuit of his claims yielded any recovery, the first amount recovered would be used to reimburse Saladini, and that Saladini would, in addition, receive 50% of any net recovery remaining after payment of attorney's fees. Saladini, herself, had no interest in Putnam Manor.

Saladini thereafter advanced funds to Righellis that he used to retain an attorney under a contingent fee agreement to bring a lawsuit and to pursue his legal claims (Putnam Manor lawsuit). At some point Righellis became dissatisfied with that attorney's representation and, with the concurrence of Saladini, hired a new lawyer, Robert Potters, to replace him. Righellis signed a new contingent fee agreement with Potters.

The original agreement between Saladini and Righellis did not anticipate retaining a second attorney to represent Righellis in the Putnam Manor lawsuit. Saladini maintains that to deal with this circumstance, she and Righellis agreed that each would pay one-half of the retainer required by Potters, each would pay one-half of the litigation disbursements, and that in all other respects the terms of their original agreement would remain in effect. No new or amended agreement was executed, but Saladini did pay one-half of the retainer to Potters and one-half of the litigation disbursements. All told, Saladini advanced a total of $19,229 to Righellis.[2]

At some point Righellis settled the Putnam Manor lawsuit,

---

[1]The judge in the Superior Court noted Saladini's claim that the doctrine of champerty had declined in modern jurisprudence. She concluded, correctly at the time she issued her decision, that the doctrine was still alive in Massachusetts, and she dismissed the entire complaint. We do not address Saladini's argument that the judge improperly dismissed her claims under G. L. c. 93A, as our decision concerning the enforceability of Saladini's agreement with Righellis revives the entire action.

[2]This consisted of an initial retainer payment of $12,000 to the first attorney, $3,250 (50% of the retainer payment) to Potters, and an additional $3,979 for expenses relating to the Putnam Manor lawsuit.

with the defendants in that case agreeing to pay him $130,000. The first payment of $10,000 was paid on or about November 2, 1994, with the balance due on January 11, 1995. Neither Potters nor Righellis informed Saladini that a settlement had been reached, or that the first settlement funds had been received.

When Saladini became aware of the settlement, she filed suit, seeking to establish her rights under the agreement. She also sought, and a judge in the Superior Court granted, injunctive relief, enjoining Righellis and Potters from disbursing any of the settlement funds until her claims had been adjudicated.

In November, 1995, Righellis filed a motion for summary judgment that Saladini opposed. After reviewing the submissions of the parties, a judge in the Superior Court, sua sponte, invited both parties to submit memoranda on the issue whether the agreement between Saladini and Righellis was champertous. A hearing followed and, in September, 1996, another judge ruled that the agreement was champertous and unenforceable as against public policy. She ordered that Saladini's complaint be dismissed in its entirety. A judgment to that effect was entered on September 24, 1996. Saladini appealed. A judge granted Saladini's motion to continue the preliminary injunction pending her appeal.

## II

Champerty has been described as the unlawful maintenance of a suit, where a person without an interest in it agrees to finance the suit, in whole or in part, in consideration for receiving a portion of the proceeds of the litigation. See *Sherwin-Williams Co.* v. *J. Mannos & Sons*, 287 Mass. 304, 312 (1934). In *McInerney* v. *Massasoit Greyhound Ass'n*, 359 Mass. 339, 348 (1971), we described the doctrine as a "narrow and somewhat technical concept," a type of maintenance that occurs when a person engages in "officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it." *Manning* v. *Sprague*, 148 Mass. 18, 20 (1888), quoting 4 Blackstone, Commentaries 134.

The doctrine has a long and, in this country, checkered history. The ancient prohibition against champerty arose in feudal England. See Radin, Maintenance by Champerty, 24 Cal. L.

Rev. 48, 64 (1935).[3] More recently the doctrine has been viewed as a check on frivolous or unnecessary litigation, or a mechanism to encourage the settlement of disputes without recourse to litigation. The extent to which courts, here, accepted the doctrine has varied. See Cox, Champerty as We Know It, 13 Memphis State U.L. Rev. 139, 141-153 (1983). In some States, champerty was never adopted, or has been abandoned. See, e.g., *Mathewson* v. *Fitch*, 22 Cal. 86, 95 (1863); *Fastenau* v. *Engel*, 125 Colo. 119, 122 (1952); *Grant* v. *Stecker & Huff, Inc.*, 300 Mich. 174, 176 (1942); *Bentinck* v. *Franklin*, 38 Tex. 458, 472-473 (1873). In others, the doctrine was given narrow application. See, e.g., *Brown* v. *Bigné*, 21 Or. 260, 267 (1891) (doctrine should apply only when "contracts are made for the purpose of stirring up strife and litigation, harassing others, inducing suits to be begun which otherwise would not be commenced, or for speculation"). Massachusetts followed the common law prohibition against champerty, see *Thurston* v. *Percival*, 1 Pick. 415, 416-417 (1823), although we have never enforced the doctrine to the same extent as English courts.[4] Nevertheless, under our own development of the doctrine we have little doubt that the agreement between Saladini and Righellis would be champertous were we to continue to recognize the offense. We no longer are inclined to do so.

We have long abandoned the view that litigation is suspect, and have recognized that agreements to purchase an interest in an action may actually foster resolution of a dispute. *Joy* v. *Metcalf*, 161 Mass. 514 (1894). In more recent cases we have questioned whether the doctrine continues to serve any useful purpose. In *McInerney, supra* at 349, quoting McKinnon, Contingent Fees for Legal Services, Report of the American Bar

---

[3]In his exhaustive history of champerty and maintenance, Professor Radin traces the concept that only interested parties be present at the determination of a controversy back to ancient Greek communities and through the middle ages. Radin, Maintenance by Champerty, 24 Cal. L. Rev. 48, 48-60 (1935).

[4]For example, we consistently have held that it is not unlawful "to engage in the business of buying choses in action and enforcing them by suit if necessary," *Gill* v. *Richmond Co-op. Ass'n*, 309 Mass. 73, 76 (1941), although under English common law assignments of choses in action are within the scope of champerty. We have not prohibited agreements otherwise champertous where the party has an independent interest in the suit. See *Williams* v. *Fowle*, 132 Mass. 385, 388-389 (1882). We also have recognized the validity of contingent fee arrangements with attorneys, which otherwise would be champertous. See *McInerney* v. *Massasoit Greyhound Ass'n*, 359 Mass. 339, 349-350 (1971).

Foundation at 210, we noted that "the decline of champerty, maintenance, and barratry as offences is symptomatic of a fundamental change in society's view of litigation — from 'a social ill, which, like other disputes and quarrels, should be minimized' to 'a socially useful way to resolve disputes.' " In *Christian* v. *Mooney*, 400 Mass. 753 (1987), cert. denied sub nom. *Christian* v. *Bewkes*, 484 U.S. 1053 (1988), we declined to consider whether an agreement between a "bounty hunter in troubled titles" (*Allen v. Batchelder*, 17 Mass. App. Ct. 453, 459 [1984]) and other plaintiffs in a suit was champertous because that issue was not contested by the parties to the agreement — even though that plaintiff's repeated instigation of litigation regarding troubled real estate titles was the very conduct traditionally condemned as violative of the prohibition against champerty. *Christian* v. *Mooney, supra* at 758 & n.7. Most recently, in *Berman* v. *Linnane*, 424 Mass. 867, 872 n.7 (1997), we declined to strike down a contingent fee agreement that did not satisfy the requirements of S.J.C. Rule 3:05, as appearing in 382 Mass. 762 (1981), as champertous, relying rather on "the public policy against the recovery of excessive fees" to limit the financial recovery by an attorney. *Id.* We observed in that case that "at least as to lawyers, other principles fulfil whatever purpose champerty once had." *Id.* These decisions all reflect the change in our attitude toward the financing of litigation.

We also no longer are persuaded that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position. There are now other devices that more effectively accomplish these ends. Our rule governing contingent fees between attorneys and clients is based on the principle that an attorney's fee must be reasonable. See S.J.C. Rule 3:05 (6); *Berman, supra* at 871. We also recognize a public policy against the recovery of excessive fees. *Berman, supra* at 872 n.7. Additional devices include Mass. R. Civ. P. 11, 365 Mass. 753 (1974), providing sanctions for misconduct, and G. L. c. 231, § 6F, regulating the bringing of frivolous lawsuits.[5] General Laws c. 93A, and the doctrines of unconscionability, duress, and good faith, establish standards of

---

[5]In addition Rule 3.1 of the new Massachusetts Rules of Professional Conduct, *post* 1301 (1998), states that a lawyer "shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that it is

fair dealing between opposing parties. To the extent that we continue to have the concerns that the doctrine of champerty was thought to address, we conclude that it is better to do so directly, rather than attempting to mold an ancient doctrine to modern circumstances.[6] As Justice Holmes, then a member of this court, said a century ago: "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." O.W. Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897).

Other States that no longer recognize the doctrine of champerty have continued to scrutinize an agreement to finance a lawsuit with care. See, e.g., *Rice* v. *Farrell*, 129 Conn. 362, 365 (1942). We shall do likewise. This means that if an agreement to finance a lawsuit is challenged, we will consider whether the fees charged are excessive or whether any recovery by a prevailing party is vitiated because of some impermissible overreaching by the financier.[7] Judges also retain their inherent power to disapprove an attorney's fee that is unreasonable. *Gagnon* v. *Shoblom*, 409 Mass. 63, 67 (1991). We shall be guided in our analysis by a rule of what is fair and reasonable, looking to all of the circumstances at the time the arrangement is made to

not frivolous." Rule 3.2 of the new rules states that a lawyer "shall make reasonable efforts to expedite litigation consistent with the interests of the client." See also S.J.C. Rule 3:07, Canon 1, DR 1-102 (A), as appearing in 382 Mass. 769-770 (1981). Rule 4.4 of the new rules states that "in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person."

[6]The doctrine of champerty may also be unworkable or have harsh results. Rather than punishing the owner of the legal claim who has entered into a champertous agreement, the doctrine bestows on him a windfall. In this case, for example, Righellis would be permitted to retain the full benefit of the positive result achieved in the Putnam Manor lawsuit, while he would not have to honor his obligations to Saladini, the person whose support made pursuit of the lawsuit possible. A defendant sued in a champerty-supported litigation may not assert the champerty as a defense, *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 220 (1978), but a court may refuse to enforce a champertous agreement even where the defense of champerty has not been asserted. *Baskin* v. *Pass*, 302 Mass. 338, 342 (1939), quoting *Reuter* v. *Ballard*, 267 Mass. 557, 563 (1929).

[7]Our ruling today should not be interpreted to indicate our authorization of the syndication of lawsuits. See Martin, Syndicated Lawsuits: 1 Illegal Champerty or New Business Opportunity, 30 Am. Bus. L.J. 485, 489-507 (1992); Dobner, Litigation For Sale, 144 U. Penn. L. Rev. 1529 (1996).

determine whether the agreement should be set aside or modified. In this case, for example, had the agreement been challenged, relevant factors might have included the respective bargaining position of the parties at the time the agreement was made, whether both parties were aware of the terms and consequences of the agreement, whether Righellis may have been unable to pursue the lawsuit at all without Saladini's funds, and whether the claim by Righellis that he will receive but $35,000 of the total $130,000 settlement award if Saladini prevails is unreasonable in the circumstances. See *Gagnon* v. *Shoblom, supra* at 71, 72 (Greaney, J., concurring); *Sullivan* v. *Goulette*, 344 Mass. 307, 312 (1962) (relying on principle that lawyer is entitled to "fair and reasonable" compensation instead of champerty doctrine where agreement was subject to authorization of Probate Court). We observe that before the judge raised the issue, Righellis had never challenged the validity of his agreement with Saladini. The record before us does not permit any conclusion regarding the reasonableness of the agreement between Righellis and Saladini on the one hand, or Righellis and Potters on the other. We see no reason why Righellis should be the beneficiary of any windfall, or why any adjustment to the financing arrangement — if appropriate at all — should be made solely at Saladini's expense. If pursued, those matters can be decided by the trial judge.

The judgment of the Superior Court in dismissing the complaint is vacated, and the case is remanded for further proceedings.

*So ordered.*