13676

NOLAND v. LAW *ET AL.*

(170 S. E., 439)

Messrs. *C. T. Graydon* and *D. T. Faulkenberry,* for appellant,

Messrs. *James S. Verner* and *James Hopkins,* for respondents,

July 24, 1933.

The opinion of the Court was delivered by Mr. Chief Justice Blease.

This is a very hard case, one we regret to have to decide. Either the appellant, Mrs. Noland, or the active respondents, Miss Caroline Law and Mrs. Elizabeth L. Dantzler, by our decision, will sustain a heavy loss. All three of them are estimable ladies, who, unfortunately, put their trust in an unfaithful member of the bar. The case is the result of the rascally conduct of Carson E. King, who is no longer, because of the action of the Grievance Committee of the State Bar Association and of this Court, entitled to practice in the Courts of South Carolina.

The facts are as follows:

Early in 1929, Miss Law and Mrs. Dantzler, sisters, in some legal matters came in contact with King, who had been recommended to them as an honest and upright lawyer. He learned that they had some money. He approached them as to making investments for them. A few days prior to May 25, 1929, King induced them to loan to R. Y. Kibler the sum of $2,000.00 on certain securities.

On May 25, 1929, Kibler executed and delivered his bond to Miss Law and Mrs. Dantzler in the sum of $2,000.00, payable May 25, 1931, with interest at the rate of 8 per cent. per annum, payable quarterly, and at the same time, to secure the payment of the bond, he executed and delivered his mortgage on certain real estate in Richland County. The drawing and execution of the papers were attended to by King, and, after the mortgage had been duly recorded, they were placed properly with Miss Law and Mrs. Dantzler. Several of the quarterly payments of interest, as they became due, were delivered by Kibler, the mortgagor, to King, who, in turn, made payment thereof to the mortgagees.

On or about November 1, 1929, King represented to Miss Law and Mrs. Dantzler that Kibler desired to pay in full the amount due on the bond and mortgage. At his suggestion, Miss Law and Mrs. Dantzler signed their names, in the presence of two witnesses, on both the bond and the mortgage in blank, and left the papers with King to collect the amount due and write the proper satisfaction above their signatures.

King did not make the authorized collection. Fraudulently, he wrote on the mortgage, above the signatures of the trusting mortgagees, an assignment in the following language: "For value, we do hereby assign, set over and deliver the within mortgage and the bond of even date it was given to secure and upon which there is due the sum of $2,000.00 with interest from the 25th day of August, 1929, unto C. E. King, his administrators, executors, and assigns, this 1st day of November, 1929." King held the papers in his pos-

session until March 20, 1930. On that day, with the fraudulent assignment he had made, he carried them to Mrs. Noland, and, upon his indorsement thereof, borrowed from her $2,000.00. In the meantime, Miss Law and Mrs. Dantzler's inquiries as to the bond and mortgage, or the money to be collected from Kibler thereon, were answered by King with various pretexts and excuses as to Kibler's failure to pay. Some time after their delivery by King to Mrs. Noland, probably in the early fall of 1930, upon the pretext that it was necessary for the bond and mortgage to be exhibited to the tax commission of the State, King induced Mrs. Noland to deliver the papers to him. He proceeded then to have entered of record the assignment to himself on the part of Miss Law and Mrs. Dantzler, and on September 25, 1930, using the bond and mortgage as collateral, he borrowed money from D. B. Ott. Soon after the papers had been placed by King with Mrs. Noland, Kibler, on March 25, 1930, sold the mortgaged premises to Bessie and Singleton Thomas, who assumed the payment of the mortgage debt of Kibler to Miss Law and Mrs. Dantzler. On April 1, 1931, Bessie and Singleton Thomas executed and delivered to King a new bond and mortgage in the sum of $2,000.00, which they were induced to believe would take up the Kibler bond and mortgage.

On May 2, 1931, King assigned the new bond and mortgage to Miss Law and Mrs. Dantzler, assuring them that the Thomas papers took the place of the Kibler bond and mortgage, which latter papers, he falsely informed the ladies, had been paid and discharged; the Kibler bond and mortgage at the time being held by Ott. A little later the husband of Mrs. Noland, on the one hand, and Miss Law and Mrs. Dantzler, on the other, became suspicious as to the conduct of King and began to make inquiries. All of them found the Kibler bond and mortgage in Ott's possession. In some way, not clearly appearing in the record, Ott's interest in the matter was settled, but he, quite properly, refused to surrender the

Kibler bond and mortgage to either Mrs. Noland or to Miss Law and Mrs. Dantzler because of their conflicting claims.

This action on the part of Mrs. Noland against Miss Law, Mrs. Dantzler, King, Ott, Kibler, Bessie Thomas, and Singleton Thomas was then instituted, the main purposes of which were the procurement by Mrs. Noland from Ott of the Kibler bond and mortgage, and the declaration of the Court that she was entitled to receive from Kibler the amount due thereon. All of the parties, with the exception of King, who evidently had no explanation to make, answered in the cause. Ott conceded that he had no interest in the matter, except to protect himself by delivery of the papers in his possession to the rightful party under the order of the Court. Kibler, it seems, admitted his liability on his bond and mortgage, seeking, however, to hold Bessie and Singleton Thomas responsible to him for the amount due thereon. Bessie and Singleton Thomas asked the cancellation of the mortgage they had given to King, being willing, as we gather from the record, to assume the payment of the Kibler mortgage. Miss Law and Mrs. Dantzler, by their answers, contended that the Kibler bond and mortgage rightfully belonged to them. The evidence was taken by the master, but the order of reference did not require him to report any findings of fact or conclusions of law. Upon consideration of the evidence and arguments of counsel, his Honor, Circuit Judge Townsend, directed that the Kibler bond and mortgage be turned over to the defendants, Miss Law and Mrs. Dantzler, and that the Thomas mortgage be canceled, and the cancellation be entered on the records. The decree of the Circuit Judge will be reported. The appeal here is on the part of the plaintiff, Mrs. Noland, from the conclusions in the decree as to the Kibler bond and mortgage.

Since the attorneys for the appellant have, in their able arguments, both oral and printed, so earnestly insisted that the decree of the Circuit Judge should be reversed, and have indicated, with much plausible reasoning, the view that the

holding in *Westbury v. Simmons*, 57 S. C., 467, 35 S. E., 764, 769, depended upon so much by the Circuit Judge, has been weakened by recent decisions of this Court, we think it our duty to say something to support the decree appealed from. We think, too, not only for the benefit of the bench and bar, but for the business interests of our people, that the Court should make clear some matters with reference to assignments of nonnegotiable instruments.

Under the common law of England, originally, the public policy was so strongly in opposition to champerty and maintenance that assignments of choses in action, so as to give the assignee any right to bring suit in his own name, was forbidden. Except in some cases coming within the law merchant, it was a declared rule that a chose in action, defined "as a personal right, not reduced into possession, but recoverable by a suit at law," could not be assigned. These rules of the early common law were substantially modified from time to time by judicial decisions, and occasionally by legislative enactment. See the interesting article on the subject of "Assignments" in 2 R. C. L., 593 et seq. At an early day, however, equity assumed to recognize assignments of choses in action, provided they were fairly made, supported by sufficient consideration, and did not contravene any recognized rule of public policy. *Ibid.*, and our own case of *Hopkins v. Hopkins*, 4 Strob. Eq. (23 S. C. Eq.), 207, 53 Am. Dec., 663, decided in 1850.

Our lawmaking body, evidently disagreeing with some of the harsh rules known to the common law, and at the same time taking notice of the tendency of judicial decisions, thought it well, in 1870, to enact some legislation relating to "Assignment of Thing in Action," and in that year passed, along with other legislation on the subject, the provisions now contained in Section 398 of the 1932 Code. That section is as follows: "In the case of an assignment of a thing in action, the action by the assignee shall be without prejudice to any set-off or other defense existing at the time of,

or before notice of, the assignment; but this section shall not apply to a negotiable promissory note or bill of exchange, transferred in good faith, and upon good consideration, before due."

The mentioned section of the Code has been discussed in cases too numerous to be referred to now. On the authority of several of them, cited by him, Mr. Justice Gary, in *Westbury v. Simmons, supra,* for the Court, said: "The principle is well settled in this State that the assignee of a nonnegotiable chose in action takes it subject to the equities existing between the original parties."

There seems, as we apprehend, to be a suggestion on the part of appellant's counsel that the words "original parties" mean the original maker and holder of the obligation, and that they do not include an assignee, who later, as assignor, assigns to another assignee. If we are correct in our assumption that this position is taken, we think it proper to state that with it we cannot agree. The language of the statute does not appear to us to be so narrow as to warrant a construction of that character. The term "original parties" is not found therein. The language, we think, is sufficiently broad to include any equities existing between not only the original parties to a written instrument, but to those existing between successive assignees as well. The words "original parties" have often been used in the decisions, because, generally, in the cases the action has been between an assignee and the original maker, who claimed equities between himself and his first creditor. The rule on this, generally followed, is stated as follows: "Successive assignees of a chose in action take the same *subject to the equities between the original assignor and his assignee,* as well as to equities existing between the original assignor and the debtor, especially where the transfer is only of all right, title, and interest of the assignee to the chose." (Italics ours.) 5 C. J., 975.

While recognizing the force and effect of the statute to which attention has been directed, the appellant relies upon the law of estoppel in connection therewith, as repeatedly followed by this Court. That law was well stated by Mr. Justice Hydrick in the case of *Middleton v. Cockfield,* 113 S. C., 282, 102 S. E., 328, 329, quoted in appellant's brief, as follows : "The principle relied upon by appellants that one who buys a nonnegotiable security takes it subject to all equities existing between the original parties is sound, but inapplicable where such original parties have, by their conduct, acts, or omissions, estopped themselves from asserting the existence of such equities. There is no conflict between the two rules."

The principles declared have been recently reiterated in other language, quoting the syllabus of a case depended upon by the appellant, that of *Davis v. Bland,* 138 S. C., 354, 136 S. E., 300, as follows : "If one of two innocent parties must suffer, it must be he who has placed it within the power of malefactor to perpetrate the wrong."

Since, under the statute and the decisions of this Court, Mrs. Noland, when she accepted from King the bond and mortgage of Kibler to Miss Law and Mrs. Dantzler, accepted and held them subject to any and all rights and equities existing between Miss Law and Mrs. Dantzler and King, and since King had no title, either legal or equitable, to the bond and mortgage, it is clear that Mrs. Noland did not acquire any title to the papers, unless it was an equitable title based upon such conduct on the part of Miss Law and Mrs. Dantzler as to estop them from asserting a claim adverse to the title of Mrs. Noland.

So the important issue in the cause relates to the conduct of Miss Law and Mrs. Dantzler.

It was established in the evidence without any question that the respondents at no time, either before or after the receipt of the papers by Mrs. Noland, said anything or did anything in a direct manner, whereby Mrs.

Noland was misled to her prejudice, or that they at any time, or in any manner, ratified the action of King.

We think, too, the evidence failed to establish in any ■ way any agency from Miss Law and Mrs. Dantzler to King to assign the bond and mortgage. So far as the record shows, this was the first instance in which King loaned money for the respondents. The loan was solicited of them by King. King was acting more as the agent of Kibler than as the agent of the respondents. Even in the payments of interest King, it appears, was acting more as the agent of Kibler than as agent of the respondents. The evidence also shows that when the bond and mortgage were turned over to King by the respondents, it was upon King's representation that Kibler, for whom he appeared to be acting, although at the time he had no authority so to act, desired to make settlement of the amount due. The papers were delivered to King with the signatures of the respondents thereon for the sole purpose of having them properly satisfied when Kibler had made payment. There was no evidence that King was given authority to make any assignment of the bond and mortgage.

The determination of the cause in favor of Mrs. Noland then, if she is to be the victor, must be upon the theory that the act of Miss Law and Mrs. Dantzler in signing their names, in blank, on the papers, and delivering them to King in that condition, was of itself sufficient to now estop them from asserting their claim to ownership.

*Westbury v. Simmons, supra,* the authority of which is mildly questioned by counsel for appellant, was a suit involving a policy of life insurance. The insured assigned it generally to his creditor, who, in turn, assigned to his creditor. The suit involving the ownership of the policy was between the administratrix of the deceased-insured and the second assignee. Holding as above stated that the second assignee took the policy subject to the equities existing between the insured and the first assignee, the Court decided that the

form of the assignment was such as to demand that the second assignee should have made inquiry as to the conditions of the first assignment, and that there was no esoppel on the part of the insured in favor of the second assignee. In that case, where the decision was favorable to the original holder, there was no question as to the assignment having been made by the insured, for it was admitted that he actually executed the assignment.

We turn to the cases decided since the *Westbury case,* depended upon by the appellant.

In *Anderson v. Citizens' Bank,* 97 S. C., 453, 81 S. E., 158, the plaintiff, Mrs. Anderson, held a bond and mortgage of one Yarley. To aid Hampton County News Company, a corporation, to borrow funds, Mrs. Anderson assigned her bond and mortgage to that company, the assignment being duly recorded, and the news company assigned the papers to the defendant bank. In the action between Mrs. Anderson, Yarley, and the bank, the decisions of both the Circuit Court and this Court were in favor of the bank as to the ownership of the bond and mortgage. Let it be remembered that Mrs. Anderson actually executed the assignment.

In the *Middleton case, supra,* the action was on the part of the last assignees against the maker of a promissory note and real estate mortgage to secure the payment of the note, the successor bank to the bank who first held the note and mortgage, and a junior mortgagee. The decision on circuit and in this Court was favorable to the last assignees, the plaintiffs. The Court held that the bank was estopped because of its conduct in assigning the note and mortgage. The assignment was actually executed by the first bank, to whose rights the defendant bank had succeeded.

*Davis v. Bland, supra,* we concede, apparently, at first reading, gives some support to the claim of the appellant, but a close study of the facts of the case clearly differentiates it, to our mind, from the case at bar. Mrs. Wheeler, who lived in Clarendon County, though O'Bryan, a lawyer of

that county, executed her bond, secured by mortgage of real estate in Clarendon County, to Bland, who lived in Sumter. Bland properly assigned the papers to Mrs. Tiller. After some time, O'Bryan notified Bland that Mrs. Wheeler wished to settle the mortgage debt, and instructed Bland to have the proper satisfaction of the papers made and send them to a bank at Manning; that Mrs. Wheeler could make payment through the bank. Bland thereupon secured the papers from Mrs. Tiller, the owner. Contrary to the instructions he had received, Bland, the original obligee of the bond and mortgagee named in the mortgage, signed his name, in blank, on the bond and mortgage, and sent the papers direct to O'Bryan. O'Bryan collected the money from Mrs. Wheeler and remitted the amount to Bland, who, in turn, settled with Mrs. Tiller; but in some way Mrs. Wheeler failed to get possession of the papers from O'Bryan. O'Bryan struck out the assignment appearing on the mortgage from Bland to Mrs. Tiller, and above the signature, in blank, of Bland on the mortgage, wrote an assignment of the papers to Davis, who paid O'Bryan the amount due on the bond and mortgage. The fraud of O'Bryan was discovered. Mrs. Tiller, having been settled with, had no interest in the bond and mortgage. Mrs. Wheeler escaped loss, since she could establish the fact of her payment of the mortgage debt. The contest then came on between Davis, the assignee, and Bland, both of whom were entirely innocent in the transactions. Davis, on account of the loss he had sustained, sued Bland in an action at law for damages. The trial in the lower Court, before the Circuit Judge, without a jury, resulted in favor of Bland, but this Court reversed the judgment. While Bland had not actually assigned the papers to Davis, and had only signed his name in blank thereon, as the appellant has pointedly called our attention to, the decision of this Court did not rest upon that fact alone. The principle announced in the case, that where one of two innocent parties must suffer, it must be the one who has placed it within the power of the wrongdoer to com-

mit the wrong, was recognized and applied. But the Court also, in its decision, had recourse to that doctrine of the law that the principal must be bound by the act of his agent, acting within the scope of the agency. Mr. Justice Cothran, who spoke for the Court, said:

"It is plain, therefore, that in the matter O'Bryan was the agent of Bland to receive the papers, to cancel the original assignment, to enter satisfaction over his signature, to collect the money due, and to remit it to Bland. He was clothed with the apparent authority to treat with these papers in any way calculated to realize the money upon them.   *   *   *

"O'Bryan's act was, if not within the actual scope of his authority, clearly within the apparent scope, and for his fraud, he who put it in his power to commit it must be the responsible party."

*Hahn v. Smith,* 157 S. C., 157, 154 S. E., 112, is also relied upon by the appellant. The authority of the case is questionable, since only two of the five Justices of this Court concurred fully in the opinion. The writer concurred generally in the opinion of Mr. Justice Cothran. Mr. Justice Stabler concurred only in the result. Chief Justice Watts agreed with the dissenting opinion of Mr. Justice Carter. For what bearing, however, the case may have, we think the facts are entirely different from those of the case at bar. The promissory note, secured by mortgage of real estate, was executed by Owens to Hughes, an attorney. The note, of course, was negotiable. Hughes, by indorsement only, transferred and delivered the papers to Mrs. Hahn for full value. Mrs. Hahn, desiring to make collection from Owens, after the maturity of the debt, through her attorneys in North Carolina, sent the mortgage to Hughes, in Marion, this State, whom this Court referred to as "her agent and attorney," for collection. The North Carolina attorneys kept possession of the note. Hughes induced Owens to execute in his favor a renewal note. Hughes sold and assigned this renewal note and the mortgage to Smith. In the case, the issues for deci-

sion were between Mrs. Hahn and Smith as to who was entitled to collect the debt, admitted to be due by Owens. The circuit decree in favor of Mrs. Hahn was reversed by this Court. Two legal principles were taken cognizance of by the author of the opinion and the writer of this opinion. First was the one that where one of two parties, both innocent of actual participation in the fraud of a third person, must bear a loss occasioned thereby, the loss should fall upon the party whose active conduct, or passive negligence, has supplied the opportunity for the fraud. The other was that the principal is responsible for the fraud of his agent, committed during the course of his agency. One important fact of that case must not be overlooked, namely, that when Hughes had the transaction with Smith, and assigned the mortgage to Smith, the mortgage on its face carried the evidence of Hughes' ownership.

In none of the cases depended upon by the appellant do we find a holding by this Court to the effect that the signing or indorsement in blank of a nonnegotiable instrument by the original holder is of itself sufficient to estop that holder from thereafter asserting his title to, or interest in, the instrument. In all the cases in which the doctrine of estoppel has been applied and sustained, the holder of the instrument did something more, either affirmatively or clearly negligently, to mislead the party in favor of whom the estoppel operated. In other words, the cases have not held that the mere signing in blank and delivery of a nonnegotiable instrument by the owner is sufficient in itself to deprive the owner of the right to later assert his claim to ownership.

The rule that such blank signing or indorsement of itself is not sufficient to constitute a valid unqualified assignment, but must be accompanied by other evidence showing an intention to assign, is stated by a well-recognized authority in the following language: "In the absence of statutory authorization, it has been held that the mere indorsement in

blank upon a non-negotiable instrument of the name of the transferor and delivery of the instrument do not constitute a valid assignment; but such indorsement in blank and delivery may constitute a valid equitable assignment if accompanied by other evidence showing an intention to assign, and in many jurisdictions statutes have been passed making nonnegotiable instruments assignable by mere indorsement and delivery so as to authorize the assignee to sue upon them in his own name." 5 C. J., 905.

There is no statute in this State providing that the mere indorsement of a nonnegotiable instrument shall of itself constitute a valid assignment.

If this Court should sustain the position of the appellant and hold that the indorsement in blank of the bond and mortgage in this case, admittedly nonnegotiable instruments, on the part of Miss Law and Mrs. Dantzler justified a conclusion that they were estopped from questioning the title to Mrs. Noland, the result would be practically to revoke the provisions of Section 398 of the Code. Furthermore, the result, in effect, would be to make negotiable all nonnegotiable instruments.

The judgment of this Court is that the decree appealed from be, and the same is hereby, affirmed.

While this cause has been pending in this Court, James S. Verner, Esq., one of the attorneys for the respondents, an excellent lawyer, highly regarded by the bench and bar, has been called away from his earthly labors. The Court wishes to acknowledge our indebtedness to him, in both his oral argument and printed brief, for the assistance he gave the Court in the preparation of this opinion and the decision of the Court.

MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.