532 S.E.2d 269

OSPREY, INC. and W. Andrew Leheup, Petitioners,

v.

CABANA LIMITED PARTNERSHIP, a South Carolina limited partnership; Maritime Development Corp., a South Carolina corporation; Bluewater Associates; William J. Reiner; Tompkins & McMaster, a South Carolina general partnership; George Hunter McMaster, and Henry Dargan McMaster, Defendants,

of whom Cabana Limited Partnership, Maritime Development Corp., Bluewater Associates, and William J. Reiner are Respondents.

No. 25124.

Supreme Court of South Carolina.

Heard March 9, 2000.

Decided May 15, 2000.

Rehearing Denied June 6, 2000.

368

A. Camden Lewis and Mark W. Hardee of Lewis, Babcock & Hawkins, L.L.P, Columbia, for petitioners.

Nelda T. Smyrl of Columbia and George Hunter McMaster of Tompkins & McMaster, Columbia, for respondents.

WALLER, Justice:

This case raises the issue of the continuing vitality of the common law doctrine of champerty, an issue this Court has not substantively addressed since 1830. The circuit court dismissed certain actions in a lawsuit brought by Osprey, Inc., and Andrew Leheup ("Plaintiffs") against Cabana Limited Partnership, Maritime Development Corp., Bluewater Associates, and William J. Reiner ("Defendants"). The Court of Appeals affirmed in part, reversed in part, and remanded the case for further inquiry. *Osprey, Inc. v. Cabana Limited Partnership,* 333 S.C. 323, 509 S.E.2d 275 (Ct.App.1998), *overruled on other grounds by I'On v. Town of Mt. Pleasant,* 338 S.C. 406, 526 S.E.2d 716 (2000). We granted Plaintiffs' petition for a writ of certiorari to review the Court of Appeals' decision. We affirm as modified.

*FACTS*

Cabana Limited Partnership was a plaintiff in a lender liability action filed in federal district court in South Carolina against Greyhound Real Estate Financing Co. and others. Two years into the federal case, with litigation expenses surpassing $100,000, Cabana attorney George H. McMaster asked Plaintiffs for a loan to help pay the expenses. McMaster's firm, Tompkins & McMaster, had represented Plaintiffs in other matters. Plaintiffs agreed in March 1993 to lend $50,000 to Defendants Cabana, Maritime, Bluewater, and Reiner. That agreement provided, in pertinent part:

> The parties acknowledge each to the other that there exists a certain Lawsuit between Cabana Limited Partnership vs. Greyhound Real Estate Finance Company, et al., and that in consideration for the advancement of the funds above, the Fifty Thousand and no/100 ($50,000.00) Dollars, Osprey, Inc. is buying an interest in that said Lawsuit. If said Lawsuit is settled or tried with a verdict in excess of Fifty Thousand and no/100 Dollars ($50,000.00) Dollars, Osprey, Inc. will receive the sum of the amount of the verdict up to a maximum of One Hundred Fifty Thousand and no/100 ($150,000.00) Dollars and the Note will be considered satisfied and paid in full. If the Lawsuit is never settled or if tried and the outcome is not in favor of Cabana Limited Partnership in an amount of One Hundred Fifty Thousand and no/100 ($150,000.00) Dollars or more, then the Debtor will remain obligated for the Note [in the] amount of the Settlement or verdict but in no event less than Fifty Thousand and no/100 ($50,000.00) Dollars.

In related loan documents, Defendants Bluewater and Cabana signed a promissory note in the amount of $50,000, bearing an annual interest rate of 15 percent, to Plaintiff Osprey; Defendant Reiner personally guaranteed the loan; Reiner assigned all his right and interest in the first $150,000 of gross proceeds from the federal lawsuit to Osprey; and Bluewater assigned its interest in certain timeshare notes and mortgages to Osprey to serve as collateral for the loan.

In January 1994, the parties settled the federal case and entered into a sealed settlement agreement. Plaintiffs sought repayment of the loan upon learning of the settlement. De-

fendants asserted they were prohibited from revealing the terms of the settlement and refused to repay the loan. The federal court ultimately granted Plaintiffs' request to disclose the settlement agreement, and Plaintiffs discovered that Defendants had received $650,000. Tompkins & McMaster was paid $200,000 for attorney's fees and the remainder was placed in escrow.

The settlement agreement required Greyhound, the defendant in the federal lawsuit, to pay $650,000 directly to Tompkins & McMaster as compensation for legal services in five related cases, including Cabana's. The agreement prohibited any payment to Cabana, and required Tompkins & McMaster to hold $450,000 in escrow pending the resolution of tax levies filed against Cabana by the Internal Revenue Service. *Tompkins & McMaster v. United States*, No. 95–1882, 1996 WL 389483, 1996 U.S.App. LEXIS 17118 (4th Cir. July 12, 1996) (unpublished opinion).

Tompkins & McMaster filed a federal lawsuit to clarify its rights to the $450,000. The firm argued that no tax levy attached to the proceeds because Cabana received nothing from the settlement and had no right to legal fees received by the firm. The Fourth Circuit Court of Appeals, in affirming the district court's dismissal of the case, rejected Tompkins & McMaster's argument. Although the money was not paid directly to Cabana, it was paid to the firm on Cabana's behalf and for its benefit. Thus, the $650,000 represented Cabana's proceeds from the federal litigation. *Tompkins & McMaster*, *supra.* Defendants assert the IRS matter has since been resolved in favor of Greyhound and Tompkins & McMaster, and against the IRS.

Plaintiffs filed suit in state court to enforce the loan agreement. Defendants moved to dismiss the complaint under Rule 12(b)(6), SCRCP, because the agreement was champertous on its face and consequently unenforceable. The circuit judge granted Defendants' motion to dismiss as champertous the causes of action for breach of contract, breach of contract of assignment, and breach of contract accompanied by a fraudulent act.[1]

---

1. The circuit judge allowed Plaintiffs' causes of action for breach of contract on the note, breach of contract of guarantee, strict foreclosure,

Plaintiffs appealed. Reviewing the matter as a motion for summary judgment pursuant to Rule 12(c), SCRCP, the Court of Appeals affirmed the circuit judge's ruling that South Carolina recognizes the doctrine of champerty. However, the Court of Appeals reversed the judge's ruling that the loan agreement is champertous as a matter of law. The Court of Appeals limited the doctrine of champerty, then remanded the case for further inquiry into the facts to determine whether the agreement is enforceable. *Osprey,* 333 S.C. 323, 509 S.E.2d 275.

## ISSUE

Does South Carolina recognize the common law doctrine of champerty and, if so, does it remain a viable defense to the enforcement of the loan agreement in this case?

## STANDARD OF REVIEW

■ This case raises a novel question of law. We are free to decide a question of law with no particular deference to the lower court. *See* S.C. Const. art. V, §§ 5 and 9; S.C.Code Ann. §§ 14–3–320 and –330 (1976 & Supp.1999); S.C.Code Ann. § 14–8–200 (Supp.1999) (granting Supreme Court and Court of Appeals the jurisdiction to correct errors of law in both law and equity actions); *I'On v. Town of Mt. Pleasant,* 338 S.C. 406, 526 S.E.2d 716 (2000).

## DISCUSSION

Plaintiffs contend the Court of Appeals erred in holding that South Carolina recognizes the doctrine of champerty. They assert that champerty is not and should not be recognized because it is rooted in feudal England. It is an outdated concept no longer needed in twenty-first century America, Plaintiffs argue. They urge the Court to refuse to recognize champerty and enforce the entire agreement as it was written.

Defendants assert the Court has long recognized champerty, should continue to recognize it, and should apply it in this case to nullify the entire loan agreement—including the

---

breach of fiduciary duty by the attorneys, and fraud to proceed because they were not barred as champertous. Those actions are still pending below.

$50,000 note and guarantee—because it is champertous as a matter of law.

We agree with the Court of Appeals that this Court previously has recognized the common law doctrine of champerty. *Osprey,* 333 S.C. at 329–30, 509 S.E.2d at 277 (citing S.C.Code Ann. § 14–1–50 (1977), which provides that "[a]ll, and every part, of the common law of England, where it is not altered by the Code or inconsistent with the Constitution or laws of this State, is hereby continued in full force and effect in the same manner as before the adoption of this section").

■■■ Champerty is defined as a bargain by a person with a plaintiff or a defendant for a portion of the matter involved in a suit in the event of a successful termination of the action, which the person undertakes to maintain or carry on at his own expense. *State v. Chitty,* 17 S.C.L. (1 Bail.) 379, 400 (1830); 14 C.J.S. *Champerty and Maintenance* § 2 (1991); 14 Am.Jur.2d *Champerty and Maintenance* § 3 (1964). A champertor is one who purchases an interest in the outcome of a case in which he has no interest otherwise. A champertous agreement is unlawful and void where the rule of champerty is recognized, and the tainted agreement is unenforceable. 14 C.J.S. *Champerty and Maintenance* § 17; 14 Am.Jur.2d *Champerty and Maintenance* § 7.

■■■ Barratry (or barretry) is the offense of frequently exciting and stirring up quarrels and suits between other individuals. *Chitty, supra;* 14 C.J.S. *Champerty and Maintenance* § 2; *Black's Law Dictionary* 150 (1990). Champerty and barratry have been described as forms of maintenance, which is defined as "an officious intermeddling in a suit that in no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend [the suit]." 14 C.J.S. *Champerty and Maintenance* § 2(b); 14 Am.Jur.2d *Champerty and Maintenance* § 2.

■■■ As explained by the United States Supreme Court, "[p]ut simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty." *In re Primus,* 436 U.S. 412, 424 n. 15, 98 S.Ct. 1893, 1900 n. 15, 56 L.Ed.2d 417, 429 n. 15

(1978). "The laws against champerty, maintenance, and barratry are aimed at the prevention of multitudinous and useless lawsuits and at the prevention of speculation in lawsuits." 14 C.J.S. *Champerty and Maintenance* § 2.

The origins of the doctrine of champerty are found in medieval England.[2] Claims and rights in those days were not freely assignable. Under English common law, the public policy originally was so strongly opposed to champerty and maintenance that assignments of a cause of action, so as to give the assignee any right to bring suit in his own name, generally were forbidden. *Noland v. Law*, 170 S.C. 345, 353, 170 S.E. 439, 442 (1933). "[T]he offense of maintenance was a broad one . . . and was so abhorred that it formed one basis for the prohibition against assigning choses in action" until the nineteenth century. *Son v. Margolius*, 349 Md. 441, 709 A.2d 112, 120 (1998) (quoting 4 William Blackstone, *Commentaries on the Laws of England* ).

To overcome such impediments, wealthy people obtained interests in legal claims, agreeing to pay the litigant's expenses in exchange for a share of the results if successful. Such claims often involved title to land, which meant that a person with capital could grow richer by becoming a joint

---

**2.** One of the first statutes prohibiting champerty was enacted by Edward I in the thirteenth century. It provided that

[n]o officer of the King by themselves, nor by other, shall maintain pleas, suits, or matters hanging in the King's courts, for land, tenements, or other things, for to have part or profit thereof by covenant made between them, and he that doth, shall be punished at the King's pleasure.

Percy H. Winfield, *The History of Maintenance and Champerty*, 35 Law Quarterly R. 50, 59 (1919).

Legal historians have traced the roots of champerty back to the Greek and Roman civilizations when the predecessors of modern lawyers were required to demonstrate a "personal connection" to a litigant before speaking on his behalf. Since ancient times, political allies have joined together to harass their enemies with vexatious litigation. Those who did so were known as "sycophants" in ancient Greece, "calumniators" in ancient Rome, and "maintainers" in medieval England. Max Radin, *Maintenance by Champerty*, 24 Cal.L.R. 48, 50–53 (1935); *Elliott Associates, L.P. v. Banco de la Nacion*, 194 F.3d 363, 372 (2d Cir.1999) ("[c]ommentators have traced the doctrine of champerty, and its doctrinal near-cousins of maintenance and barratry, back to Greek and Roman law, through the English law of the Middle Ages, and into the statutory or common law of many of the states").

.

owner of a landed estate. Champertors, both the wealthy and those desiring to become wealthy, financed the claims of the others, often the poor and the dispossessed, against people upon whom the champertors sought to inflict financial or political injury. Feudal magnates had numerous retainers, including professional maintainers, who brought suits financed by the magnate. Those maintainers took all necessary steps to win, including the employment of bullies to prevent an opponent from appearing in court at a critical moment. Champerty was a "means by which powerful men aggrandized their estates and the background was unquestionably that of private war." Max Radin, *Maintenance by Champerty*, 24 Cal.L.Rev. 48, 58–64 (1935); *see also* Percy H. Winfield, *The History of Maintenance and Champerty*, 35 Law Quarterly R. 50, 57–68 (1919); R.D. Cox, *Champerty As We Know It*, 13 Memphis St.U.L.R. 139, 143–60 (1983).

Neither secular nor clerical medieval courts were able to prevent or police such agreements. Collusion among the landed gentry, sheriffs, judicial officials, and the king's ministers to obtain money and land through the maintenance of a stranger's lawsuit was rampant in medieval England. Radin, *supra;* Winfield, *supra;* Cox, *supra.* King after king tried to eradicate the practice, but never wholly succeeded because those who were called upon to enforce the law often were the worst offenders. Winfield, *supra,* at 65.

Legal historians view champerty as a final "flaring up" of the feudal era, a last-ditch effort of feudal lords to combat the limits and framework of the monarchy. It embodied a resistance of the moneyed class to capitalistic forces that had begun to take root across Europe in the eleventh and twelfth centuries. Radin, *supra,* at 64–66.

Efforts to prevent champerty and maintenance were grounded in several concerns: the king's desire to prevent litigation involving his own interests or those of his supporters; clerical opposition to litigation generally, especially in secular courts; a general dislike of usury, or the practice of loaning money at interest; and the belief that litigation was, in itself, an undesirable and distasteful affair, regardless of the merits of a lawsuit. Radin, *supra,* 60–67.

With that background, this Court's strong language and unequivocal condemnation of champerty evident in *State v. Chitty, supra,* is understandable. In *Chitty,* the defendant magistrate, an attorney, was found guilty of the crime of barratry. The magistrate constantly urged people to swear out warrants and cross-warrants in order to generate additional fees for himself. In affirming the conviction, the majority stated that some authorities suggest

> that if a man lay out money, in behalf of another in suits at law to recover a just right, he is not a barretor, and that he may do this in respect of the poverty of the party. Some subsequent writers also, losing sight of the reason of the rule, have laid it down, generally, that it was not barretry to spend money in promoting the suit of another to recover a just right. But ... in the case referred to, it is expressly laid down, that if one lend money to promote and stir up suits, he is a barretor....
>
> The busybody, the deceiver, the vile knave, or unthrift, who excites others to litigation, with an intention to vex, and oppress, and by this means extort money, is ... an offender against public justice.
>
> Maintenance, it seems, is a species of barretry; and champerty, and conspiracy belong to the same class of offences, and yet it never entered into the mind of any man, that he who unlawfully maintained a suit, bargained to divide the field, or conspired with others, was less a maintainer, champertor, or conspirator, because the cause was just [and not rooted in a selfish or oppressive motive].... The temple erected and consecrated to Justice is not, however, to be polluted with impunity, by those who would prostitute the rules regulating its police to base and unworthy purposes....
>
> The pursuit of right, whether public or private, can never be an offence; where justice alone is the end in view; but every perversion of the machinery of the law to other purposes, by coupling it with improper objects, is reprehensible. Hence if one lay out money in the prosecution of a suit to recover a close, of which his poor neighbor has been deprived, and without which he must lose it, he is no champertor, because, right, humanity, and justice would approve it: but if he do it upon a stipulation, that he shall

receive one half of the field, if it be recovered, he is, according to the legal definition of this offence, a champertor.

*Chitty*, 17 S.C.L. (1 Bail.) at 399–401. The *Chitty* court, then, plainly believed champerty was a perverse practice that should be eradicated as a matter of public policy, regardless of whether the champertor's motive is to see justice done or merely financial gain for himself.

We have found only two cases other than *Chitty* which reveal much about this Court's past view of champerty. In *Cooke v. Pool*, 25 S.C. 593 (1886), the Court rejected a champerty argument. The Court appeared much less disturbed by signs of champerty than the *Chitty* court had been fifty-six years earlier.

In *Cooke*, a plaintiff who obtained a default judgment assigned it to attorney Thompson Cooke for $100. Thompson Cooke, who was not an interested party in the litigation that resulted in the default judgment, then assigned the judgment to his brother, Henry Cooke, in payment of a debt. The defendants asserted Henry could not enforce the judgment because the original assignment of the judgment to Thompson was champertous.

The *Cooke* court disagreed. The Court concluded that, although Thompson probably could not have sought to enforce the judgment because the transfer to him was champertous and in violation of a statute, Thompson's assignment to brother Henry was not void for champerty. The Court found that the record supported the lower court's finding that Henry was a bona fide holder of a regular and valid assignment who had no notice of the tainted title.[3]

---

**3.** The parties discuss several other South Carolina cases. None are particularly helpful or relevant because they involved agreements that were not champertous. In each one, the party defending the agreement as not champertous had a legitimate interest in the litigation. *See McSwain v. Davis*, 96 S.C. 155, 80 S.E. 87 (1913) (finding that document giving McSwain the right, at McSwain's expense, to take legal action necessary to execute an option contract given by previous landowner was not champertous, apparently because McSwain had an obvious interest in the litigation); *Ex parte Hiers*, 67 S.C. 108, 45 S.E. 146 (1903) (concluding an assignment by the husband of a lawsuit he initially brought to his wife was not champertous because they were "still regarded as one in law"; furthermore, the money which the

This Court appeared similarly unfazed by medieval notions of champerty when it found an English statute enacted by Henry VIII, which was intended to prevent champertous conveyances, inapplicable in South Carolina. *Poyas v. Wilkins*, 46 S.C.L. (12 Rich.) 420, 428 (1860) (a conveyance of land by one out of possession is not void for champerty).

In this case, the Court of Appeals remanded the matter for further inquiry into whether "Plaintiffs, in lending the Defendants money for litigation expenses, engaged in officious intermeddling with the intention to stir up strife or otherwise unnecessarily prolong a lawsuit." *Osprey*, 333 S.C. at 330–31, 509 S.E.2d at 279.

The Court of Appeals relied on three cases from other jurisdictions. In two of those, it appears the court rejected the champerty argument because the alleged champertor was not really a champertor at all under a modern view of the

husband had sought to recover was the wife's inheritance); *Fraser & Dill v. Charleston*, 13 S.C. 533, 545 (1880) (concluding devisees' assignment to City of Charleston of rights relating to stock issued by the city, after the stock was fraudulently conveyed by the testator's personal representative, was not a champertous agreement; city as a proper assignee had right to take legal action to protect the thing assigned).

Champerty frequently is raised when it really is not an issue at all because an agreement involves a party who, in the modern view, has a valid interest in a lawsuit. *See e.g., In re Perrysburg Marketplace Co.*, 208 B.R. 148 (Bankr.N.D.Ohio 1997) (prosecution of secured claim against Chapter 11 debtor-mortgagor by mortgagee, which had purchased debtor's loan from Resolution Trust Corporation, did not constitute champerty); *Schwartz v. Eliades*, 113 Nev. 586, 939 P.2d 1034 (1997) (agreement between two cab company owners to share litigation expenses and any proceeds in defamation suit, where other owners assigned their interest in the suit to the two, was not champertous because neither owner was a stranger to the lawsuit); *Rienhardt v. Kelly*, 121 N.M. 694, 917 P.2d 963 (Ct.App.1996) (agreement by testator's son with residuary beneficiary of testator's will, in which son agreed to pay for beneficiary's litigation costs in suit to dispute validity of agreement between decedent and another for purchase of ranch for nominal amount of money, was not champertous given that son, as heir of testator, had property interest in lawsuit).

As the Massachusetts Supreme Judicial Court has explained, "[i]f a party has an interest independent of and prior to the allegedly champertous arrangement, or even the possibility of an interest, in the subject litigated, the agreement to carry on the litigation at his own expense in consideration of having part of the recovery is not champertous and illegal." *Berman v. Linnane*, 424 Mass. 867, 679 N.E.2d 174, 177 (1997).

assignability of rights, but actually had a legitimate interest in the action. *See Temeron, Inc. v. Ferraro Energy Corp.*, 861 P.2d 319, 325–26 (Okla.Ct.App.1993) (alleged champertor had the right, under a consulting contract it signed with gas supplier to review supplier's records, to bring suit on supplier's behalf to recover underpayments and retain percentage of proceeds; court reversed summary judgment for defendant on grounds of champerty, recognizing the alleged champertor had a legitimate interest in the matter); *Giambattista v. Nat'l Bank of Commerce of Seattle*, 21 Wash.App. 723, 586 P.2d 1180, 1186–88 (1978) (alleged champertor was a money broker who agreed to pay litigation expenses for its client depositors whose certified checks were not handled properly by a bank; court reversed grant of summary judgment for defendant on grounds of champerty, recognizing the alleged champertor had a legitimate interest in the matter); *see also* cases cited in footnote 3.

A third case cited by the Court of Appeals is quite similar to the present case. In *Kraft v. Mason*, 668 So.2d 679 (Fla.Dist. Ct.App.1996), a sister loaned her brother $100,000 to pay litigation expenses in an ongoing antitrust lawsuit. The loan agreement called for the sister to receive interest on the loan, plus a declining percentage of any settlement or judgment obtained. After the case settled for more than $5 million, the brother reneged on the deal because of an unrelated family dispute with his sister. He refused to pay some $355,000 he owed her under the agreement. *Id.* at 681–83.

The *Kraft* court rejected the brother's champerty defense. The court reasoned that times have changed since the medieval era when champerty was strongly disfavored. The court held that officious intermeddling was a necessary element of proving a champerty defense, and found no such intermeddling. The trial court correctly had rejected the champerty argument because the sister had simply loaned her brother money to continue an ongoing case.

Accordingly, under *Kraft* and our Court of Appeals' opinion in this case, an agreement is void for champerty when the champertor is a "stranger" to the lawsuit with no legitimate interest in it; the champertor provides money to litigate the suit; the champertor is entitled by the agreement to share in

the proceeds of the suit; and the champertor is an officious intermeddler who intended to stir up strife or unnecessarily prolong the suit. Officious intermeddling occurs when the champertor offers unnecessary and unwanted advice or services, especially in a highhanded or overbearing way. *Osprey,* 333 S.C. at 330–31, 509 S.E.2d at 279.

Some observers have asserted the doctrine of champerty ought to be limited in such a manner, and urge courts to avoid linking champerty today to the champerty of medieval times. "Under all circumstances, it would be well to omit all attempts to connect [champerty] with the medieval offenses which had a rationale of their own, and deal with it as a modern phenomenon to be judged by modern standards and in relation to existing conditions." Radin, *supra,* at 66. Instead of voiding agreements that appear champertous as a matter of law, courts should scrutinize the agreement and the surrounding circumstances to determine whether to enforce the agreement. Such scrutiny "will substitute judgment by reality for judgment by category." *Id.* at 78.

Courts following this view typically reason that "[i]t sometimes may be useful and convenient, when one has a just demand which he is not able from poverty to enforce, that a more fortunate friend should assist him, and wait for his compensation until the suit is determined, and be paid out of the fruits of it." *Metropolitan Life Ins. Co. v. Fuller,* 61 Conn. 252, 23 A. 193, 196 (1891); *see also Richardson v. Rowland,* 40 Conn. 565 (Conn.1873) (applying law of New York to reject champerty defense and allow plaintiff who helped defendant resolve a mortgage dispute recover half of proceeds of settlement; opinion lists cases illustrating states were evenly split in nineteenth century on validity of champertous agreements); Ari Dobner, *Litigation for Sale,* 144 U.Pa. L.Rev. 1529, 1543–55 (1996) (discussing modern view of champerty in various states and explaining that, although states take different approaches, most seek to limit evils traditionally associated with champerty—frivolous lawsuits or speculation in groundless suits).

The Massachusetts Supreme Judicial Court recently eschewed medieval concepts of champerty, choosing instead to rely on other well-developed principles of law to prevent evils

traditionally associated with champertous agreements. In *Saladini v. Righellis*, 426 Mass. 231, 687 N.E.2d 1224 (1997), Saladini advanced litigation expenses to Righellis to enable him to pursue his claims in a real estate dispute. In return, Saladini would receive half of any net recovery, after payment of attorney's fees. Saladini, who had no other interest in the real estate dispute, paid some $19,000 in expenses on Righellis' behalf. Righellis settled the suit for $130,000, but did not tell Saladini. When Saladini learned of the settlement, she brought an action to enforce the agreement. Righellis asserted the agreement was champertous and thus unenforceable.

The *Saladini* court disagreed, and abolished the doctrines of champerty, barratry, and maintenance after reviewing their "checkered history" in Massachusetts and elsewhere. The court explained that causes of action and contract rights are freely assignable today, unlike in medieval times. More importantly, "the decline of champerty, maintenance, and barratry as offences is symptomatic of a fundamental change in society's view of litigation—from a social ill, which, like other disputes and quarrels, should be minimized to a socially useful way to resolve disputes." *Id.* at 1226 (internal quotes omitted). The court no longer was persuaded

> that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position.... To the extent that we continue to have the concerns that the doctrine of champerty was thought to address, we conclude that it is better to do so directly, rather than attempting to mold an ancient doctrine to modern circumstances. As Justice Holmes ... said a century ago: "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

*Saladini*, 687 N.E.2d at 1226–27. (quoting O.W. Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 469 (Jan. 8, 1897)).

■ We find persuasive the reasoning of our own Court of Appeals and the *Saladini* and *Kraft* courts. However, instead of limiting the doctrine of champerty as the Court of Appeals

did, we abolish champerty as a defense. We are convinced that other well-developed principles of law can more effectively accomplish the goals of preventing speculation in groundless lawsuits and the filing of frivolous suits than dated notions of champerty.

For example, a lawyer is prohibited from prosecuting a frivolous lawsuit and may face various sanctions if he or she files frivolous pleadings. *See* Rule 3.1 of the Rules of Professional Conduct (RPC) contained in Rule 407, SCACR ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); Rule 11, SCRCP (allowing sanctions against attorney if there is no good ground to support a pleading or if it is interposed for delay). A litigant forced to endure a frivolous lawsuit has a statutory remedy in the South Carolina Frivolous Civil Proceedings Sanctions Act. S.C.Code Ann. §§ 15–36–10 to –50 (Supp.1999).

Furthermore, the doctrines of unconscionability, duress, and good faith establish standards of fair dealing between opposing parties. *E.g., U.S. for Use and Benefit of Williams Elec. Co. v. Metric Constructors, Inc.,* 325 S.C. 129, 480 S.E.2d 447 (1997) ("[e]very contract contains implied obligation of good faith and fair dealing"); *Fanning v. Fritz's Pontiac–Cadillac–Buick, Inc.,* 322 S.C. 399, 472 S.E.2d 242 (1996) (discussing unconscionability). In addition, the Legislature has defined barratry, i.e., the promotion or exciting of groundless judicial proceedings, as a misdemeanor offense. S.C.Code Ann. §§ 16–17–10 & 16–1–100(B) (1985 & Supp.1999) (defining offense of barratry); S.C.Code Ann. § 16–17–50 (1985) (statutory barratry provisions are cumulative and not intended to repeal any common law provisions regarding barratry).

■ Our abolition of champerty as a defense does not mean that all such agreements are enforceable as written. When an agreement to finance a lawsuit is challenged, the court must "consider whether the fees charged are excessive or whether any recovery by a prevailing party is vitiated because of some impermissible overreaching by the financier." *Saladini,* 687

N.E.2d at 1227. The court must be guided by an analysis of what is fair and reasonable under the circumstances.

The court may examine (1) whether the respective bargaining position of the parties at the time the agreement was made was relatively equal, (2) whether both parties were aware of the terms and consequences of the agreement, (3) whether the borrowing party may have been unable to pursue the lawsuit at all without the financier's help, (4) whether the financier would retain a disproportionate share of the recovery, and (5) whether the financier engaged in officious intermeddling. *See Saladini,* 687 N.E.2d at 1227; *Osprey,* 333 S.C. at 330–31, 509 S.E.2d at 279. A financier becomes an officious intermeddler when he or she offers unwanted advice or otherwise attempts to control the litigation for the purpose of stirring up strife or continuing a frivolous lawsuit. *See Smith v. Hartsell,* 150 N.C. 71, 63 S.E. 172, 174 (1908) (stating it has come to be generally accepted that an agreement will not be condemned as champertous unless the interference is clearly officious and for the purpose of stirring up strife and continuing litigation); *Osprey, supra; Kraft, supra.* After analyzing these factors and any others the court deems relevant, the court may enforce, modify, or set aside the financing agreement.

We note two peripheral matters that we do not address today. First, the case before us involves a financial arrangement between non-lawyers. Various ethical constraints closely control and in many instances prohibit business transactions between a lawyer and his or her client. *See* Rule 1.8, RPC. In particular, a lawyer may not acquire a proprietary interest in the subject matter of litigation the lawyer is conducting for a client, except that the lawyer may acquire a lien to secure the lawyer's fees or expenses, and the lawyer may contract with a client for a reasonable contingent fee in a civil case. Rule 1.8(j), RPC. We do not address whether a lawyer may act as a financier in a case involving a litigant who is not the lawyer's client. *See* Susan Lorde Martin, *Syndicated Lawsuits: Illegal Champerty or New Business Opportunity?,* 30 Am.Bus. L.J. 485, 488 (1992) (listing statutes in several states that prohibit attorneys or others connected with the judicial pro-

cess from engaging in maintenance and champerty).[4]   Second, our decision today neither addresses nor authorizes the syndication of lawsuits, a practice in which a litigant sells shares in his lawsuit to investors.   *See* Martin, *supra;*   Dobner, *supra* (discussing syndication of lawsuits).

## CONCLUSION

We abolish champerty as a defense because we believe it no longer is required to prevent the evils traditionally associated with the doctrine as it developed in medieval times.   Accordingly, we affirm, with the modifications we have outlined, the Court of Appeals' decision to reverse the grant of summary judgment to Defendants.   We remand this case to circuit court for further proceedings consistent with our opinion.

■   Because the issue may arise again upon remand, we reject Defendants' argument that Plaintiffs have no claim to the $650,000 paid to Defendants' attorneys by Greyhound to settle the federal litigation.   Although the money was not paid directly to Cabana, it was paid to the Tompkins & McMaster firm on Cabana's behalf and for its benefit.   *See Tompkins & McMaster, supra.*   We have considered Defendants' remaining arguments and find them unpersuasive.

AFFIRMED AS MODIFIED.

FINNEY, C.J., TOAL, MOORE, and BURNETT, JJ., concur.

---

**4.**   Lawyers who accept cases on a contingency fee basis may appear to be champertors under the traditional meaning of the term.   Such lawyers are strangers to the lawsuit who may advance litigation expenses and their services in exchange for a percentage of a successful result.   *See* Radin, *supra,* at 66–67;   Dobner, *supra,* at 1532.   Contingency fees generally are viewed favorably in the United States, unlike other countries.   American courts do not view such fee agreements as champertous.   *See* 14 C.J.S. *Champerty and Maintenance* § 11;   14 Am.Jur.2d *Champerty and Maintenance* § 4;   W. Kent Davis, *The International View of Attorney Fees in Civil Suits: Why Is the United States the "Odd Man Out" in How it Pays its Lawyers?,* 16 Ariz. J. Int'l & Comp. L. 361 (1999) (discussing pros and cons of contingency fees and explaining how they are viewed as champertous in some nations);   Robert H. Roether, *The Forest for the Trees: Judicial Activism in the Tort Marketplace,* 78 Mich. B.J. 706 (1999) (explaining positive aspects of contingency fees).