# JOHN D. WHEELER *vs.* HARRISON & BYRD.

*Contract by Lawyers to Procure Release of a Party From a Claim—Performance of the Contract Within a Reasonable Time—Contingent Fee—Champerty and Maintenance—General Exceptions to Testimony.*

A number of the subscribers to the stock of a corporation determined to resist the efforts of the corporation to collect from them the amounts subscribed and made a contract with the plaintiffs, who are attorneys at law, by which the latter were employed to defend suits brought to enforce subscriptions and to take steps to relieve the subscribers from liability. Each subscriber agreed to pay to the plaintiffs a sum equal to eight per cent of the amount from the payment of which he should be released as a result of suits instituted or defended for him by the plaintiffs " or otherwise ; " and also agreed to pay at once two per cent of the amount of his subscription to the shares of stock to be applied by the plaintiffs to the payment of expenses. Suits by the corporation were instituted against some of the subscribers which were defended by the plaintiffs, and they prepared themselves to defend all suits by taking depositions, etc. No such suit was instituted against the defendant in this case, who was one of the parties to the agreement. Seven years after the contract was made the corporation abandoned its claim against all of the subscribers. Plaintiffs procured a release of the defendant from the claim, and upon his refusal to accept it or to pay the compensation stipulated for in the contract this action was brought. *Held*,

1st. That the agreement between the plaintiffs and the defendant was not a mere offer by the latter which lapsed by the efflux of time, because the services contemplated were not rendered by the plaintiffs within a reasonable time, but it was a binding contract to pay the stipulated sum when the defendant should be released from liability on his subscription whether that result should be accomplished by means of plaintiffs' successful defense of a suit or otherwise.

2nd. That since no time was mentioned in the contract for the procuring of the release, and if it be conceded that it should impliedly be done within a reasonable time, then, when all the facts are proved, whether it was done within a reasonable time is a question of law, and the evidence in this case does not show that there was unreasonable delay on the part of the plaintiffs in procuring the release.

3rd. That the contract sued on was not unlawful as involving champerty or maintenance.

When a general exception is filed to testimony taken under a deposition and some of the testimony is admissible, then the objection to the whole is properly overruled.

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.) The agreement referred to in the opinion of the Court is as follows:

Know all men by these presents, that whereas I, the undersigned have agreed to employ and do hereby employ and constitute W. Roy Stephenson and the firm of Harrison & Byrd my legal counsel and attorneys in fact, to represent and for me and in my name to institute and conduct for me such suit or suits, and to defend me in any suit or suits, and take such other action for me as may seem to my said legal counsel proper and necessary to defend me against the payment and release me from the payment of my subscription to the capital stock of the Equity Improvement Company of Winchester, Va., and I hereby authorize and empower my said attorneys to employ such agents or others to aid them as they may deem necessary; and I hereby ratify and confirm all that my said attorneys, or either of them shall do in the premises in pursuance thereof.

Now, therefore, in consideration of the premises and of the said services of my said attorneys and legal counsel, I hereby promise and agree to pay to them on demand a sum equal in amount to two per cent of the total face or par value of all stock of said Equity Improvement Company subscribed to by me, and now standing in my name, and I further agree that if I shall be saved and released by the efforts of my said attorneys, or either of them, by suits instituted, or defended by them or either of them, or otherwise, from the payment of my said subscription, or part thereof, or in case I shall hereafter compromise or settle with said Equity Improvement Company for its claim against me for said subscription—in either event I agree to pay to my said attorneys a compensation for their services to be divided equally, viz: one-half to said firm of Harrison & Byrd, and one-half to said W. Roy Stephenson, the further sum equal to eight per cent of the amount from the payment of which I shall have been saved or released, as aforesaid, or by said compromise. The said two per cent shall be applied as far as it will go by my said attorneys to the pay-

ment, first, of such expenses as may properly be incurred by them, or either of them, in my behalf hereunder, then to costs of suit or suits, and any balance thereof remaining in part compensation for their services equally as aforesaid ; no part thereof to be returned to me.

The compensation herein stipulated for shall be in full of all charges to be made by my said attorneys in their behalf, or in behalf of attorneys employed by them for their professional services in the premises.    I hereby waive the benefit of my homestead exemption as to this contract.    The number of shares of said stock subscribed for by me is opposite my name.

Witness my hand this 1st day of January, 1892.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PEARCE, SCHMUCKER and JONES, JJ.

*Richard B. Tippett* and *Wm. S. Bansemer*, for the appellant.

Defendant's promise to pay eight per cent of the amount saved was an offer which could become a binding contract only by plaintiffs' acceptance thereof by performance.  *Benjamin* v. *Bruce*, 87 Md. 255.   Now no time is mentioned in which such performance is to be made.   In every such case the law steps in and declares that the performance (which is the only acceptance of the offer) must be made within a reasonable time ; and the reasonableness of the time where the facts in regard to the performance are not disputed, is a question of law for the Court.

" The law implies, no time being specified that the contract is to be performed immediately or within a reasonable time." *Brennan* v. *Ford*, 46 Cal. 7; *Mizell* v. *Burnet*, 4 Jones L. (N. C.) 255, say : " If one is bound and the other is foot-loose, the terms must be short, for it would be unreasonable to keep the parties in so unequal condition for a long time."   After the lapse of a reasonable time the offer lapses and there is no necessity for actual withdrawal.  *Ramsgate Victoria Hotel Company* v. *Montefiore*, L. R. 1 Exch. 109.

The offer to pay the 8 per cent if the appellees were success-

ful, and procured for the defendant a release, is simply an offer of a promise for an act. The law applicable to this class of contracts is shown in *Mitchell* v. *Abbott*, 86 Me. 338, 25 L. R. A. 503. Also, *Loring* v. *Boston*, 7 Met. 412.

A situation similar to the one here, was presented in the case of *Smith* v. *Bruner*, 68 Ill. App. 61, 64. A number of people signed an agreement that if the owner of a coal mine sank a shaft to what is known as third-vein coal, each would pay to the owner the sum of $50.00 for the first ton of said coal delivered to him. Two years elapsed and the offerees delivered to one of the signers a ton and the latter refused to receive it or pay the subscription. In a suit against the signer it was held that the work was to be prosecuted with reasonable diligence and *completed* within a reasonable time. That the contract was not a license to complete the sinking of the shaft at any time in the future ; that the lapse of time was unreasonable, and that the offerees could not at that late date claim the benefit of subscription.

In *Morse* v. *Bellows*, 7 N. H. 563, the proposition of the defendant to the plaintiff in 1828 was, " If you get me a discharge from those creditors, I will pay you what I am bound to pay them." The Court held that there must be a compliance within a reasonable time. That what is a reasonable time is a question of law. That a compliance within two years was held reasonable. But also that if the plaintiff does not perform before the situation of the defendant in regard to the claims against him had changed, he cannot recover.

In determining what is a reasonable time, the rule is that the reason or necessity for the making of the offer must be taken into account. *Shaub* v. *Lancaster City*, 156 Pa. St. 362.

So that when the plaintiff comes with this tardy performance the situation of the defendant has, in the lapse of time, so changed that the performance is utterly valueless to him, and since, by the tardy performance, he does not receive what he contemplated when he made the offer, no consideration for his offer has arisen and no contract has been made. *Davis* v. *Hubbard*, 41 Wis. 408, 411; *Pittsburg R. Co.* v. *Myers*, 32 Pa. St. 22.

It is the most prominent fact in the whole case, that the presentation of this release in the fall of 1899, was far from being what Mr. Wheeler made the promise for. At this late day the release was not worth the paper it was written on. Without the slightest effort on the part of Mr. Wheeler, the company had closed down and abandoned any efforts to collect subscriptions. This it did on its own volition; and the plaintiff's own testimony, to wit, that of the company's president, Major Conrad, states that nothing that the plaintiffs did influenced the company to abandon its claim against subscribers. In 1892, the release was something desired by Wheeler, for which he was willing to pay. After the lapse of almost nine years, the release was nothing to him and the company, beginning with the resolution of August, 1892, had ceased to consider him a debtor. The plaintiff-appellees, as if seeking to recover on a *quantum meruit*, in their own testimony, make the attempt to show that their services in behalf of themselves and their Virginia clients were of value to Wheeler. But these unsuccessful efforts are shown to have been made only up to the year 1895. In 1894 the appellees, weary of such efforts in behalf of themselves and their Virginia clients, entered into an agreement to continue those Virginia cases generally, and from that time on down to 1899, nothing was done by the appellees. The Court below ignored the question of reasonableness of time by granting the plaintiffs' fourth prayer, and by rejecting the defendant's prayer by which as the foregoing authorities show the question was properly raised.

Assume, for the argument's sake, that the plaintiffs have so performed, that a contract has arisen between them and the appellees, yet even then the plaintiffs suit must fail for such contract is void for champerty and maintenance. *Nicklers* v. *Kane,* 82 Va. 313; *Duke* v. *Harper,* 66 Mo. 60; *Peck* v. *Heurich,* 167 U. S. 629; *Belding* v. *Smythe,* 138 Mass. 513; *Johnson* v. *Van Wyck,* 4 D. C. App. Cas. 315; *Burman* v. *Heselton,* 82 Me. 495.

· *Charles W. Field,* for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

The Equity Improvement Company was incorporated by the Legislature of Virginia in eighteen hundred and ninety, and in March of that year, it opened books in Winchester for subscriptions to its capital stock. The company was one of many development enterprises which sprang up about that period and flourished for awhile and then disintegrated. Amongst those who became shareholders was the appellant. He subscribed for one thousand shares of the capital stock of the par value of five dollars per share. During the year eighteen hundred and ninety, he paid to the company five calls of fifty dollars each, leaving a balance due of four thousand seven hundred and fifty dollars. It was not long after the Company's organization that dissentions crept into the management and many subscribers refused to pay the installments called for on their subscriptions. A number of suits were then brought by the company to recover those called installments, and the appellees were employed by the dissident shareholders to defend them. Amongst those dissidents there were at least eighteen who resided in Baltimore, some of whom were sued, and some, including the appellant, were not sued. When it became apparent that considerable litigation confronted the dissatisfied shareholders it was thought that a combined and concerted resistance on their part to the demands of the corporation would be more efficacious than the separate and individual defenses of the several defendants might probably be ; and accordingly an agreement was prepared which was to be signed, and ultimately was signed, by the persons who proposed to contest the exactions of the company. This agreement which will be fully set out in the Reporter's statement of the case, was signed by the appellant in January, eighteen hundred and ninety-two. By that agreement the appellees were employed to institute and conduct and defend, for the signers, such suits and to take such other action as might seem to the appellees proper and necessary to relieve the signers from the payment of, and to release them from their subscriptions to the capital stock of the Equity Improvement Company ; and each

of the signers of that agreement stipulated that if he should be saved and released by the efforts of the appellees from the payment of his subscription, either as a result of suits instituted or defended by them or " otherwise," then he would pay to the appellees a sum equal to eight per cent of the amount from the payment of which he might thus be saved or released; and each signer further agreed that upon executing the agreement he would pay to the appellees a sum equal to two per cent of the total face or par value of all the stock of said company subscribed for by him. The sum represented by the two per cent was directed to be applied by the appellees to the payment of such expenses as might properly be incurred by them under and in virtue of their employment and then to the costs of suit and the balance, if any, was to be retained by the appellees in part compensation for their services.

Various proceedings were had in the Virginia Courts, but none of the suits there ever came to trial on the merits. Finally they were abandoned by the company in eighteen hundred and ninety-nine. The suits in Baltimore were also abandoned, and during the year last named releases were procured by the appellees from the company for all the clients they represented. A release in due form was tendered to the appellant, but he declined to receive it and he also declined to pay the two and the eight per cent compensation stipulated for in the contract. His refusal to pay was based upon the grounds to be hereafter stated. Suit was then brought against him to recover the two and the eight per cent. The case was tried in the Court of Common Pleas before the Judge at large without the intervention of a jury. During the progress of the trial four exceptions were reserved. Three of them were taken to the refusal of the Court to exclude certain evidence and the fourth to the rulings on the prayers for instructions. A judgment was entered for the appellees for eight per cent on the sum of four thousand, seven hundred and fifty dollars—that being the amount of the appellant's unpaid subscription—but the two per cent on the total five thousand dollars subscribed was disallowed, because barred by the Statute

of Limitations.   From that judgment the appeal now before us was taken.

The main question in the case arises on the appellee's fifth and the appellant's first prayer.   A discussion and consideration of the latter will dispose of the former.   As the appellant's prayer is a demurrer to the evidence and challenges the right of the appellees to recover, because of there being no evidence legally sufficient to entitle them to a verdict, it will be more convenient and will tend to brevity if we proceed to examine it first.   There are two grounds upon which it has been contended that the evidence is insufficient to entitle the appellees to recover; and these are, *first*, that the agreement between the dissident shareholders and the appellees was a mere offer which not having been performed by the procurement of a release until after the expiration of seven years from the time the offer was made, was no longer binding on the appellant; and, *secondly*, because the agreement is void by reason of being tainted with champerty and maintenance.

It is scarcely necessary to remark that in dealing with a demurrer to the plaintiff's evidence the truth of that evidence must be assumed.   Its truth cannot be controverted though distinctly contradicted, for it is not the province of the Court to weigh its credibility when considering merely its legal sufficiency.   If, upon the assumption that the evidence is true, it be legally sufficient to sustain a verdict, then no matter how flatly it may be contradicted it cannot be withdrawn from the jury on the ground of being legally insufficient to justify a recovery.   So we must lay aside all that was deposed to by the president of the company to the effect that he was not influenced in any way in executing the releases by anything that had been done by stock subscribers in defending suits brought against them ; that he was not influenced by any apprehension that the subscribers could not be made to pay their subscriptions, and that his individual action in this case was certainly not induced by anything that was done at any time or anywhere by the appellees.   We are then brought to inquire what the agreement between the appellant and the appellees

was and whether the evidence shows that anything was done by the appellees under it.

If the instrument relied on as an agreement was in fact no agreement at all, but was simply an offer under which nothing was done by the appellees within a reasonable time after its execution, there can be no recovery, and the Court would have done right had it granted the appellants prayer. If, on the other hand, the instrument was a valid agreement the appellees could not recover on it had there been no evidence adduced to show that they had in one or the other of the designated ways secured the release of the appellant from liability on his subscription to the company's capital stock. And finally, if the instrument, though more than a mere offer was a contract tainted with champerty or maintenance no action could be maintained upon it any event.

There can be no doubt about the legal principle that an unaccepted offer does not constitute a contract. The authorities cited by the learned counsel of the appellant fully sustain that principle, and we need not pause to consider them, because we have no fault to find with them. The difficulty lies not with the principle, but with its application to this case. Does the paper-writing of January, eighteen hundred and ninety-two, which was signed by the appellant and upon which the appellees found their right to recover, amount merely to an offer on the part of the appellant to pay a sum of money upon the procurement of a release by the appellees—an offer not binding until accepted by the appellees and until consummated by performance within a reasonable time? We do not so interpret it. In terms it unequivocally employs the appellees in their professional capacity as lawyers to perform certain legal services for the appellant and it fixes the rate at which and the contingency upon which their compensation is to be paid. The specific purpose for which they were employed was to procure the release of the appellant from paying to the Equity Company the remaining amount due by him on his stock subscription. This was not an offer to pay them provided they performed certain services—it was a distinct agree-

ment to pay a stipulated compensation upon their securing a particular result, whether that result—the procurement of a release—were accomplished by the agency of suit instituted or defended for the appellant " or otherwise." The agreement was, therefore, not an offer in the sense in which that term is used in the cases cited. As for instance in *Mitchell* v. *Abbott*, 86 Me. 338, where a reward was offered for the apprehension of an offender who was not arrested until twelve years afterwards. The Court very properly said, such an offer is a proposal merely. And so in *Morse* v. *Bellows*, 7 N. H. 549, where the proposal was " If you get me a discharge from those creditors, I will pay you what I am bound to pay them." It was held that to entitle the plaintiff to recover there must have been a compliance with the proposal and a compliance within a reasonable time. But the agreement involved in this proceeding is an unconditional employment to do a specific thing. There being no time mentioned within which the specific thing was to be done, even if it be conceded that a reasonable time is implied by law, what is a reasonable time must depend on the circumstances of each case and when the facts have all been proved that becomes a question of law. *Loring* v. *Boston*, 7 Met. 409.

The evidence shows and shows in quite a satisfactory way that the appellees performed a large amount of professional labor in behalf of the clients they represented, in the controversies arising out of the efforts of the Equity Company to collect the unpaid subscriptions. Whilst no suit was ever brought against the appellant, the work done by the appellees in the suits which were brought and the other efforts made by them to procure releases, was work done and were efforts made in behalf not only of those who had been sued, but of others similarly situated who had not been sued, but were liable to be sued. The work done and the efforts made in behalf of some enured to the benefit of all the clients whom the appellees represented. As stated by one of the appellees in his deposition : " After our employment by a number of subscribers to the capital stock of the Equity Improvement Company

the plaintiffs in this suit entered upon the discharge on our part of the services and undertakings which we had agreed to perform for Mr. Wheeler and other clients similarly situated." During the period covered by these services the company proposed to settle with the dissident subscribers for thirty per cent of their subscriptions; but this offer was rejected by the appellees. It would serve no useful purpose to narrate all that the appellees did in fulfilment of their engagement. They took depositions in Scranton, Pennsylvania, to be used in the trial of the Virginia and the Maryland cases; they examined into the regularity and good faith of the company's organization and, according to the undisputed evidence, thoroughly prepared themselves to resist every demand upon the clients they represented. In many of the cases they filed elaborate pleas and though those pleas were held bad exceptions were reserved so that the rulings might be reviewed in the Court of Appeals of Virginia. By persistent efforts in striving to force the Virginia cases to trial, they finally drove the company to abandon those suits and ultimately procured formal releases for all their clients, including the appellant. This labor extended over six or seven years and during no part of that time were the appellees ever advised by the appellant that he considered his agreement as no longer binding, because not performed within a reasonable time. If in point of fact the instrument sued on had been only an offer, and if the appellant had desired to revoke it, he should have notified the appellees, because they were entitled to consider the offer unchanged until a revocation was communicated to them. *Wheat* v. *Cross,* 31 Md. 99. But the evidence does not show an unreasonable delay in procuring the release. As we have stated the litigation stretched over a considerable space of time and over a wide territory. It has not been proved that the final result could have been accomplished any earlier; and we cannot say, in the face of all the facts disclosed by the record, that as matter of law there was unreasonable delay in procuring the release.

Suppose the appellees had negligently suffered a judgment to be recovered against the appellant by the Equity Company,

can it be doubted that they would have been liable to him in an action for damages if by reason of that negligence he had been compelled to pay his stock subscription when there was a valid defense which the appellees could have made and which if they had made would have protected the appellant completely? They would have been unquestionably liable. And they would have been liable, because under the contract of employment they were bound to use their skill in defending him. There was a duty on their part and obviously, therefore, the instrument signed by the appellant was not a mere offer, as he now contends. We read the contract to mean an absolute and unqualified employment of the appellees to do certain designated professional work for the appellant, their compensation being made contingent upon the procurement of a release. In that view of it, it becomes quite immaterial whether there was much or little delay in securing the release.

We find nothing to justify the contention that the agreement was or is tainted with champerty or maintenance. In defining maintenance Mr. Greenleaf says: " This crime is said to consist in the unlawful taking in hand or upholding of quarrels or sides to the disturbance or hindrance of common right. It is of two kinds ; namely, *Ruralis,* or in the country ; and *Curialis,* or in the Courts. The former is usually termed *champerty* ; and is committed where one upholds a controversy under a contract to have part of the property or subject in dispute. The latter alone is usually termed *maintenance;* and is committed where one officiously and without just cause, intermeddles in and promotes the prosecution or defense of a suit in which he has no interest, by assisting either party with money, or otherwise."   3 *Green. Ev.,* sec. 180.   Under neither classification does the contract sued on fall. The appellees were not upholding a controversy under a contract to have part of the property or subject in dispute. They undertook to defend the appellant and others against what were considered unlawful demands made by the Equity Company, and their compensation, which was contingent, was to be a percentage of the amount from the payment of which they should

succeed in releasing their clients. The specific appropriation of the two per cent named in the contract to the payment of costs and expenses was an appropriation of the client's own money and can in no sense be treated as indicating that the appellees without just cause were promoting the defense of a suit in which they had no interest, and promoting it by assisting the defendants with money.

The views we have thus far expressed are sufficient to indicate that there was no error committed in granting the prayers of the plaintiff or in rejecting that of the defendant.

The only remaining questions are those presented by the *first*, *second* and *third* bills of exception. These relate to the admissibility of evidence. All of the testimony objected to was taken under a commission. The objections filed to the admissibility of some parts of it were very general, and did not indicate with precision the exact interrogatories and answers which the appellant sought to exclude. Portions of the testimony to which the objections applied were admissible whilst other parts might not have been ; but when an objection is general and includes the admissible as well as the inadmissible it must be overruled. *Burgoon* v. *Bixler*, 55 Md. 389. Upon that ground alone the objections were properly overruled. But even if the inadmissible testimony had been improperly admitted its admission did no injury, and where no injury has been done no reversal will be ordered though there has been error ; for error and injury must both concur to warrant a reversal. *Williams* v. *Higgins*, 30 Md. 404.

Upon a review of the whole record we find no injurious errors and the judgment appealed against will, therefore, be affirmed.

*Judgment affirmed with costs above and below.*

(Decided December 5th, 1901.)