MICHAEL, Circuit Judge,
dissenting:
A number of tenants at factory outlet malls engage Accrued Financial Services, Inc. (AFS) to audit common area maintenance charges that landlords add to the tenants’ rent bills. AFS takes an assignment of any claims discovered in the audits and retains a percentage of any overcharges collected as a fee for its services. This sounds like a sensible arrangement, and it is one that is legal under California law, the law chosen by AFS and the tenants to govern their contracts. The majority outlaws the assignments, however, saying that the assignments stir up lawsuits and allow AFS to supply expert testimony for a contingent fee, all in violation of the public policy of Maryland, the forum state. I respectfully dissent for two reasons. First, the Restatement (Second) of Conflict of Laws § 187, which Maryland has adopted, requires that the contracting parties’ choice of California law be honored in this case. Even if Maryland law did apply, it would not prevent the tenants from protecting themselves through the arrangement chosen for the discovery and collection of overcharges, an arrangement that avoids litigation more than nine times out of ten. Second, because AFS owns the claims that are the subject of this lawsuit, the company is not supplying expert testimony for a contingent fee.
I.
AFS is a California-based company that provides lease audit services for tenants operating stores in factory outlet malls throughout the United States. Mall landlords, such as Prime Retail, Inc. (Prime),[1] commonly require their tenants to sign leases that obligate the tenants to pay assessed charges for common area maintenance expenses. These charges cover cer *301 tain mall operating expenses, ranging from real estate taxes to marketing and promotional costs. In some cases, the leases require the tenants to pay into a reserve fund that is set aside to cover these expenses. Invoices to tenants for common area maintenance charges are usually in summary form. The leases, however, permit the tenants to conduct audits of these charges. That is where AFS comes in: it conducts the audits for tenants.
According to AFS, an audit usually reveals some errors in charges billed to the tenant, and occasionally an audit uncovers overly aggressive or dishonest calculation of charges. In most cases, each tenant’s claim for an audit period (usually one year) is relatively small in dollar amount. Thus, most tenants do not find it economically feasible to conduct their own audits. But AFS, by securing audit engagements from several tenants in the same mall and then conducting a single audit for those tenants, makes the contractual right to conduct audits meaningful for the individual tenant. AFS performs the audits in return for a percentage of any overcharges it collects. The contingent nature of AFS’s compensation also helps to make the audits affordable. Overcharges are collected without litigation more than ninety percent of the time.
AFS’s authority to conduct the lease audits and pursue collection of overcharges is set forth in two agreements entered into between AFS and the tenant, a “Letter of Agreement Regarding Leased Location” and an “Assignment of Cause of Action.” In the “Letter of Agreement” the tenant designates AFS as its representative to conduct a lease audit, and AFS agrees to “use reasonable efforts to ascertain ... whether [the tenant] has been overcharged for any Tenant Contributions.” The tenant assigns any overcharges to AFS. AFS is authorized “to contact, negotiate, and settle” with the landlord and “to file all lawsuits under AFS’s name as plaintiff.” For its work, AFS retains 40 to 50 percent of any overcharges recovered, and the tenant gets the balance. The “Assignment of Cause of Action” spells out the details in routine fashion. The tenant assigns to AFS “any and all causes of action it may have against” the landlord. “Full authority is conferred on Assignee [AFS] to perform all lawful acts deemed necessary by Assignee, or its agents, to pursue and collect on the assigned cause of action. As-signee may adjust, compromise, or settle the assigned cause of action at its reasonable discretion.” AFS must “advance all litigation costs incurred and be personally liable for those costs.” In addition, “[u]n-der no circumstances shall Assignor [the tenant] be liable for any litigation costs in excess of any recovery on the claim.” Finally, the assignment provides that it will “be governed by and construed in accordance with the laws of California.”
In 1997 AFS began audits at Prime, which owns and manages factory outlet malls where a number of AFS’s clients are tenants. The audits were commenced in Michigan and Maryland. According to AFS, the audits uncovered improper charges and reserve assessments that cannot be explained as inadvertent errors or even as aggressive billing practices. AFS claims that that the audits revealed a systematic effort by Prime to conceal from the tenants the improper nature of many of the charges assessed. AFS further claims that it discovered a pattern of fraud on the part of Prime that has likely resulted in millions of dollars in overcharges to tenants. Finally, AFS claims that when it began to uncover the scheme in the audit it was conducting in Maryland, Prime stopped the audit before it was finished. The majority opinion describes several lawsuits (the first one was filed by Prime) that ensued between Prime and AFS, after *302 Prime refused to negotiate. In this case, AFS, as assignee of seventeen tenants with stores in dozens of malls, sues Prime for breach of express and implied lease covenants, fraud, and violations of RICO and the California unfair competition statute.
II.
A.
The majority’s main holding is that the tenants’ assignments to AFS are void because they violate a strong public policy in Maryland against “stirring up litigation,” whether it be called maintenance, cham-perty, or barratry. Ante at 300. The majority thus rejects California law, the law chosen by AFS and the tenants to govern the application and validity of the assignments. California does not recognize the doctrines of maintenance and champerty, see Abbott Ford, Inc. v. Superior Court, 43 Cal.3d 858, 239 Cal.Rptr. 626, 741 P.2d 124, 141 n. 26 (Cal.1987), and no person can be convicted of barratry unless he has corruptly or maliciously “excited” at least three vexatious lawsuits, see Cal.Penal Code § 159 (2002). The assignments are therefore valid under California law. The majority nonetheless contends that the choice of law provision is not enforceable because the chosen (California) law violates a fundamental policy of the forum state, Maryland. The majority is wrong, I respectfully suggest, because three conditions must be present before Maryland will refuse to apply, for public policy reasons, the law selected by the parties to a contract. None of these conditions are present in this case.
Maryland recognizes “that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract.” Kronovet v. Lipchin, 288 Md. 30, 415 A.2d 1096, 1104 (Md.1980). Maryland relies on section 187 of the Restatement (Second) of Conflict of Laws to determine the validity of a contractual choice of law provision. Nat’l Glass, Inc. v. J.C. Penney Props., Inc., 336 Md. 606, 650 A.2d 246, 248 (Md.1994); Ciena Corp. v. Jarrard, 203 F.3d 312, 323 (4th Cir.2000). Section 187(2) of the Restatement provides in pertinent part:
The law of the state chosen by the parties to govern their contractual rights and duties will be applied, ... unless
(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
Restatement (Second) of Conflict of Laws § 187(2) (Supp.1989). Three conditions must therefore be met before Maryland would reject California law on the ground that Maryland public policy is implicated. First, Maryland law must apply in the absence of an effective choice of law provision. Second, the California law must be contrary to a fundamental (or strong) public policy of Maryland. Third, Maryland must have a materially greater interest than California in the out-come of the particular issue, here, whether the assignments are legal. The majority never addresses the first and third conditions even though all three must be met under the Restatement rule adopted by Maryland. See Nat’l Glass, 650 A.2d at 248-251.
As to the first condition, the question is whether Maryland law would apply if the parties had not made a choice in their contract. Maryland relies on lex loci con- *303 tmctus if there is no choice of law provision. Am. Motorists Ins. Co. v. ARTRA Group, Inc., 338 Md. 560, 659 A.2d 1295, 1301 (Md.1995). “Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction.” Kramer v. Bally’s Park Place, Inc., 311 Md. 387, 535 A.2d 466, 467 (Md. 1988). This case was decided on Prime’s motion to dismiss, and there is no suggestion in the pleadings or in the motion papers that the assignment contracts between AFS and its clients (the outlet mall tenants) were made in Maryland. Indeed, it appears highly unlikely that the contracts would have been made in Maryland because AFS is located in Long Beach, California, and none of the tenants are headquartered in Maryland. In sum, at this stage the record does not allow a determination that Maryland law would apply to the assignments in the absence of a choice of law provision. Thus, the first condition of § 187(2)(b) of the Restatement has not been met.
For the second condition, the question is whether California law — the law that would allow the assignments — violates a strong public policy of Maryland. The existence of a routine difference between California and Maryland law would not be sufficient to satisfy this condition: “merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy.” Am. Motorists, 659 A.2d at 1301 n. 3. Rather, for the second condition to be met, there must be a strong public policy against the enforcement of the foreign law in Maryland. Bethlehem Steel Corp. v. G.C. Zarnas & Co., 304 Md. 183, 498 A.2d 605, 608 (Md.1985). So far, the only time Maryland courts have found a contractually chosen law to violate strong Maryland policy is when the foreign law conflicts with a Maryland statute that contains a clear statement of policy. See Bethlehem Steel, 498 A.2d at 608 (law of chosen state permitted a contract that a Maryland statute expressly described as one that “is against public policy” and “is void and unenforceable.”); Nat’l Glass, 336 Md. at 613, 650 A.2d at 250 (chosen law clashed with Maryland statute stating that “any provision ... made in violation of this section is void as against the public policy of this State.”). The Maryland courts have not yet said whether a chosen law is contrary to a public policy that can only be inferred from Maryland’s common law. In any event, strong Maryland public policy cannot “be represented by a [common law] rule [that is] tending to become obsolete.” Restatement § 187(2) cmt. g (Supp.1989). Maryland’s common law on maintenance, champerty, and barratry appears to be tending toward obsolescence because, as far as I can tell, Maryland has not used these common law doctrines to invalidate any contract in the last one hundred years.[2] Indeed, as far back as 1868 the Court of Appeals of Maryland noted that “the common law notion of maintenance, as applicable to the assignments of rights of action, had become practically obsolete.” Schaferman v. O’Brien, 28 Md. 565 (1868) (quoting Story’s Equity Jur. § 1057). Accordingly, no strong public policy against the California law allowing the assignments in this case can be gleaned from *304 whatever, if anything, might remain of the common law doctrines of maintenance, champerty, and barratry in Maryland.
If there is any strong public policy to be found here, it must be found in Maryland’s barratry statute. For that statute to evidence strong Maryland policy, the policy must be “expressly stated” or “explicitly] determin[ed]” by the General Assembly. Nat’l Glass, 650 A.2d at 249-50 (internal quotations and citations omitted). Maryland’s barratry statute, as applied to non-lawyers, provides: “Without an existing relationship or interest in an issue ... a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit.” Md.Code Ann., Bus. Occ. & Prof. § 10-604(a)(1) (2000). The General Assembly has not made any express statement of strong public policy in this language. It is simply a run-of-the-mill misdemeanor provision.
There is, then, no indication that application of the law of the chosen state, California, would be contrary to any strong public policy of Maryland. But even if it could be shown that the assignments violated strong Maryland policy, that would not end the matter because it still “must [be] determine[d] whether Maryland has a materially greater interest in the determination of the issue.” General Ins. Co. of Am. v. Interstate Serv., Inc., 118 Md.App. 126, 701 A.2d 1213, 1218-19 (Md.Ct. Spec.App.1997). In determining whether Maryland has a materially greater interest in an issue, the courts of Maryland (1) evaluate the contacts the parties and their contract have with Maryland and the chosen state and (2) take into account strong Maryland public policy that bears on the issue. See Nat’l Glass, 650 A.2d at 250-51. The contacts listed in Restatement § 188(2) are the ones evaluated in deciding which state has a materially greater interest. See, e.g., Ticknor v. Choice Hotels Int’l, Inc., 265 F.3d 931, 938 (9th Cir.2001). These contacts include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and,
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
Restatement (Second) of Conflict of Laws § 188(2) (1971).
Factor (e), which focuses on the location of the contracting parties and their places of incorporation, favors California. AFS is a California corporation, with its sole place of business in Long Beach, California. Four of AFS’s clients are headquartered in California, and none are headquartered in Maryland. Factors (a) and (b), which focus on where the contract was negotiated and made, almost certainly favor California: given the contracting parties’ physical locations, there is no reason to believe that the contracts were negotiated or entered into in Maryland. Factor (d), relating to the location of the subject matter of the contracts (here, the outlet stores and leases), also appears to favor California. At least a dozen of AFS’s seventeen clients have outlet stores in California, and only five have stores in Maryland. Every client with stores in both states has more stores in California than in Maryland. For example, client Claire’s Boutiques, Inc. has four stores in California and two in Maryland. Information relevant to factor (c), the place of performance of the contracts, is somewhat sparse. We do know that AFS started audits in Michigan and Maryland and that Prime forced AFS to stop the Maryland audit before it was completed. The Maryland audit, which Prime itself ended, is the only contact that could *305 count in Maryland’s favor. In any event, when the information about all of the factors is considered together, California has significantly more contacts with the matter than Maryland.
As mentioned, in deciding which state has a materially greater interest (the third condition of Restatement § 187(2)(b)), Maryland also considers whether it has a strong public policy against the chosen law. Nat’l Glass, 650 A.2d at 251. Here, of course, Maryland has no strong public policy against champerty, maintenance, or barratry. Because the contacts strongly favor California, and because Maryland has no strong public policy against the assignments, it is evident that California has a materially greater interest in the outcome of this case than Maryland. In conclusion, because the contracting parties’ choice of California law must be respected under the terms of Restatement § 187(2)(b), California law governs any issue concerning the validity of the assignments. The majority, which fails to conduct a full analysis, errs in holding that Maryland would not honor the choice-of-law provision agreed to by AFS and its clients, the outlet mall tenants.
B.
There is another fundamental problem with dismissing AFS’s case. The limited record, which was made in connection with Prime’s motion to dismiss, does not establish that AFS’s conduct meets the legal standards required for whatever is left of the doctrines of champerty, maintenance, and barratry in Maryland. Again, Maryland does have a barratry statute which provides: “Without an existing relationship or interest in an issue ... a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit.” Md.Code Ann., Bus. Occ. & Prof., § 10-604(a)(1) (2000). According to the Maryland Court of Special Appeals, “[t]he essence of [the crime of] barratry is the solicitation of another to make a litigious claim by one without an existing relationship or interest for his own gain.” Schack-ow v. Medical-Legal Consulting Serv., Inc., 46 Md.App. 179, 416 A.2d 1303, 1312 (Md.Ct.Spec.App.1980). AFS was not pushing or soliciting litigation here. AFS’s first, and most important, task under the agreements and assignments was to conduct audits, audits the tenants had the right to pursue under their leases. If AFS found an overcharge, it had the authority to contact the landlord and obtain a refund or negotiate a settlement. Litigation is available as a last resort, and AFS has had to pursue litigation in relatively few cases. AFS’s president, Mark S. Ma-lan, confirms this in his unrefuted affidavit:
In my 15 years of performing reviews of commercial leases and 5 years experience in performing lease audits, it has only rarely been necessary to commence legal action against a landlord or management company to collect overcharges. In fact, I estimate that litigation has been required in less than 10% of the engagements for which we have been retained.
AFS thus did not solicit its clients to make litigious claims. In this case, in particular, litigation became necessary only because Prime shut down an audit and refused to negotiate. AFS has thus not committed barratry under the Maryland statute, and it has not been “stirring up litigation” or “mining for lawsuits,” as the majority charges.
Even if the common law doctrines of champerty, maintenance, and barratry are not obsolete in Maryland, what is left of them does not apply to this case. In the first place, these doctrines do not outlaw *306 every effort by a person to encourage or assist another in pursuing litigation. The Maryland Court of Appeals recognized this in Son when it quoted Lord Abinger, Chief Baron of the Court of Exchequer, who said: “if a man were to see a poor person in the street oppressed and abused, and without the means of obtaining redress, and furnished him with money and employed an attorney to obtain redress for his wrongs, it would require a very strong argument to convince me that that man could be said to be stirring up litigation and strife.” Son, 709 A.2d at 120 n. 5 (quoting Findon v. Parker, 11 M. & W. 679 (1843)). Lord Abinger’s comment in 1843 is simply the starting point. Today, we allow many practices that encourage litigation. For example, contingent fees are legal, Maryland Rules of Professional Conduct 1.5(c); lawyers are allowed to advertise, Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); choses-in-action may be assigned, Hernandez v. Suburban Hosp. Assoc., Inc., 319 Md. 226, 572 A.2d 144 (Md.1990); and class actions are permitted, Fed. R.Civ.P. 23.
The common law, to the extent it is still viable, would thus not outlaw all efforts to facilitate litigation. Rather, it would be aimed at the stirring up of a certain kind of litigation, specifically, litigation that is groundless, vexatious, or multitudinous. See Osprey, Inc. v. Cabana Ltd. P’ship, 340 S.C. 367, 532 S.E.2d 269, 273 (S.C.2000) (“The laws against champerty, maintenance- and barratry are aimed at the prevention of multitudinous and useless lawsuits.”). When the allegations in the complaint in this case are taken as true, as they must be on a motion to dismiss, it cannot be said that AFS is pursuing, or encouraging the pursuit of, groundless, vexatious, or multitudinous litigation. Rather, AFS makes a serious claim, based on a partial audit, that Prime over-charged its tenants, through aggressive billing or fraud, in amounts that could total millions of dollars. Moreover, because AFS must bear the expenses of any unsuccessful litigation, it is unlikely that it would waste its resources on a pointless lawsuit. In any case, if AFS has filed a frivolous or vexatious lawsuit — and there is no indication thus far that it has — there is a way to deal with the problem without outlawing the assignments. Rule 11, for example, allows stiff sanctions to be imposed upon lawyers and parties who present pleadings “for any improper purpose, such as to harass” or who present pleadings that lack “evidentia-ry support.” Fed.R.Civ.P. 11(b), (c).
The doctrines of champerty, maintenance, and barratry were also meant to protect against “financial overreaching by a party of superior bargaining position.” Saladini v. Righellis, 426 Mass. 231, 687 N,E.2d 1224, 1226 (Mass.1997). The majority implies that AFS engaged in overreaching here, saying that the assignments leave the tenants with the Hobson’s choice of either allowing AFS to pursue litigation or buying back their claims for an amount equal to AFS’s fees. There is every reason to believe that the tenants, who are large outlet store companies such as Anne Klein Factory Stores, Inc., Corning Revere Factory Stores, Publisher’s Warehouse, and Lechter’s, were able to bargain with AFS on equal footing. Indeed, the tenants are substantial companies, and AFS has less than a half dozen employees. It is reasonable to conclude that had the tenants not found the assignments to be advantageous, they would not have executed them. Also, there is no evidence that any tenant was reluctant to allow AFS to sue Prime because all of the tenants ratified their assignments after the lawsuit began. Thus, the majority’s argument that the assignments serve AFS’s interests more than its clients’ (the tenants’) inter *307 ests is without any foundation. Although it is true the tenants could have retained their claims and sued in their own names, history has proven that option to be uneconomical in most instances. That is why the tenants assigned their claims to AFS in the first place. The majority’s decisión thus hurts the tenants, not just AFS. The decision benefits the mall owners and managers, who could be getting away with overcharging and fraud.
C.
The majority wants to stamp out “lawsuit-mining arrangements” and vexatious lawsuits. This is a worthy goal, but the majority takes an unprecedented step to achieve it. The majority restricts the tenants’ right to contract, specifically, the right to enter into assignment contracts that provide a cost-efficient means of protecting against sharp billing practices and fraud by landlords at outlet malls. The State of Maryland does not have any fundamental policy or law that dictates this result. Cf. U.S. Const, art. I § 10 (“No State shall ... pass any ... law impairing the Obligation of Contracts”). Today’s decision also means that AFS is barred from suing on the assigned claims that it legitimately owns. That is overkill.
III.
The majority also holds that the assignments are void and unenforceable as a matter of public policy because, the majority claims, AFS is being paid a contingent fee for supplying expert testimony. I respectfully disagree. I recognize, of course, that “[a]n agreement with a witness to pay him a fee contingent on the success of the litigation is against public policy and void.” Van Norden v. Metson, 75 Cal.App.2d 595, 171 P.2d 485, 488 (Cal.Dist.Ct.App.1946). However, AFS was not hired to provide expert testimony. Instead, AFS was hired as an auditor, and any claims uncovered in the audit are assigned to AFS. The assign-merits make AFS the real party in interest, and a corporation that is a real party in interest may offer in its own case the testimony of its principals and employees.
Nor are AFS and the tenants attempting to mask a contingent fee witness arrangement behind an assignment. The assignments are, in most respects, routine. AFS has full authority to do what is necessary “to pursue and collect on the assigned causes of action,” including settling in “its reasonable discretion.” AFS must advance all litigation costs and is responsible for those costs if the litigation is unsuccessful. AFS does, of course, “receive as a commission for [its] services [forty to fifty percent] of the Net Recovery.” Nonetheless, because these contracts transfer the claims to AFS and provide that AFS will sue in its own name, control the litigation, and pay all litigation costs, they are true assignments. AFS is therefore the real party in interest, and it may offer the testimony of its own people without violating any public policy against supplying expert testimony for a contingent fee.
I respectfully dissent.

. “Prime” includes Horizon Group, Inc., a company acquired by Prime.

. The majority does not cite a single case in which a contract was found to violate any Maryland common law against maintenance, champerty, or barratry. The assignment contracts in both Schaferman v. O’Brien, 28 Md. 565 (1868), and Wheeler v. Harrison, 94 Md. 147, 50 A. 523 (Md.1901), were upheld. The majority's only case from the last hundred years, Son v. Margolius, Mallios, Davis, Rider & Tomar, 349 Md. 441, 709 A.2d 112 (Md.1998), focused on Maryland’s barratry statute. In any case, the agreement in Son was also upheld.